# EXHIBIT A

# PLAINTIFFS' AMENDED COMPLAINT

**SALTZ MONGELUZZI BENDESKY, P.C.**
BY: ROBERT J. MONGELUZZI/LARRY BENDESKY/
ANDREW R. DUFFY/AIDAN B. CARICKHOFF/
OLIVIA S. SZUMSKI
IDENTIFICATION NO. 36283/51026/77121
/330394/331725
52ND FLOOR
1650 MARKET STREET
PHILADELPHIA, PA  19103
(215) 496-8282



*Filed and Attested by the Office of Judicial Records 09 MAY 2024 11:41 am G. IMPERATO*

**ATTORNEYS FOR PLAINTIFFS**

| | |
|---|---|
| **JENNIFER WEST, as Administratrix of the ESTATE OF DAVID WEST, Deceased, and In Her Own Right** c/o Saltz Mongeluzzi Bendesky, P.C. 1650 Market Street, 52nd Floor Philadelphia, PA 19103 *and* | **PHILADELPHIA COUNTY COURT OF COMMON PLEAS LAW DIVISION** **MAY TERM, 2024** **NO. 1584** **JURY TRIAL DEMANDED** |

**AMANDA DAULTON, as Administratrix of the ESTATE OF DARREN DAULTON, Deceased**
c/o Saltz Mongeluzzi Bendesky, P.C.
1650 Market Street, 52nd Floor
Philadelphia, PA 19103

*and*

**JOHN AND MELISSA KRUK, h/w**
c/o Saltz Mongeluzzi Bendesky, P.C.
1650 Market Street, 52nd Floor
Philadelphia, PA 19103

*and*

**DANNY AND BARBARA JACKSON, h/w**
c/o Saltz Mongeluzzi Bendesky, P.C.
1650 Market Street, 52nd Floor
Philadelphia, PA 19103

*and*

**NICOLE STOLARICK and VINCENT VUKOVICH, as Co-Administrators of the ESTATE OF JOHN VUKOVICH, Deceased**
c/o Saltz Mongeluzzi Bendesky, P.C.
1650 Market Street, 52nd Floor
Philadelphia, PA 19103

*and*

**GLORIA OATES, as Administratrix of the ESTATE OF JOHNNY OATES, Deceased, and In Her Own Right**
c/o Saltz Mongeluzzi Bendesky, P.C.
1650 Market Street, 52nd Floor
Philadelphia, PA 19103

*and*

**TIMOTHY MCGRAW AND JENNIFER BRUSSTAR, as Co-Administrators of the ESTATE OF FRANK MCGRAW, JR., Deceased**
c/o Saltz Mongeluzzi Bendesky, P.C.
1650 Market Street, 52nd Floor
Philadelphia, PA 19103

*Plaintiffs*

*vs.*

**ALCO CHEMICAL MANUFACTURING COMPANY INC.**
825 Duportail Road
Valley Forge, PA
19482

*and*

**ALCO CHEMICAL CORPORATION**
825 Duportail Road
Valley Forge, PA
19482

*and*

2

Case ID: 240501584

**ACLO STANDARD CORPORATION**
825 Duportail Road
Valley Forge, PA
19482

*and*

**NOURYON CHEMICALS LLC**
100 Matsonford Road
Building 1, Suite 500
Radnor, PA 19087

*and*

**NOURYON SURFACE CHEMISTRY LLC**
100 Matsonford Road
Building 1, Suite 500
Radnor, PA 19087

*and*

**NOURYON USA LLC**
100 Matsonford Road
Building 1, Suite 500
Radnor, PA 19087

*and*

**ASTROTURF INDUSTRIES INC.**
1 City Center, Suite 2100
St. Louis, MO 63101

*And*

**3M COMPANY, f/k/a
MINNESOTA MINING AND
MANUFACTURING CO.**
3M Center, Building 225-1S-23
Saint Paul, MN 55144

*And*

3

Case ID: 240501584

**EIDP INC., d/b/a and/or f/k/a E.I. DU PONT DE NEMOURS AND COMPANY**
c/o CT Corporation System
600 N. 2nd Street, Suite #401
Harrisburg, PA 17101

*And*

**DUPONT DE NEMOURS, INC.**
c/o CT Corporation System
600 N. 2nd Street, Suite #401
Harrisburg, PA 17101

*And*

**CORTEVA, INC.**
974 Centre Road
Wilmington, DE 19805

*And*

**JOHN DOES 1-2**

*Defendants.*

---

"NOTICE

"You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by an attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgement may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

"YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.
IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.
　　PHILADELPHIA BAR ASSOCIATION
　　LAWYER REFERRAL and INFORMATION SERVICE
　　One Reading Center
　　Philadelphia, Pennsylvania 19107
　　(215) 238-1701"

"AVISO

"Le han demandado en corte. Si usted quiere defenderse contra las demandas nombradas en las páginas siguientes, tiene veinte (20) dias, a partir de recibir esta demanda y la notificación para entablar personalmente o por un abogado una comparecencia escrita y tambien para entablar con la corte en forma escrita sus defensas y objeciones a las demandas contra usted. Sea avisado que si usted no se defiende, el caso puede continuar sin usted y la corte puede incorporar un juicio contra usted sin previo aviso para conseguir el dinero demandado en el pleito o para conseguir culquier otra demanda o alivio solicitados por el demandante. Usted puede perder dinero o propiedad u otros derechos importantes para usted.

USTED DEBE LLEVAR ESTE DOCUMENTO A SU ABOGADO INMEDIATAMENTE. SI USTED NO TIENE ABOGADO (O NO TIENE DINERO SUFICIENTE PARGAR A UN ABOGADO), VAYA EN PERSONA O LLAME POR TELEFONO LA OFICINA NOMBRADA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASSISTENCIA LEGAL. ESTA OFICINA PUEDE PROPORCIONARLE LA INFORMACION SOBRE CONTRATAR A UN ABOGADO.

SI USTED NO TIENE DINERO SUFICIENTE PARA PAGAR A UN ABOGADO, ESTA OFICINA PUEDE PROPORCIONARLE INFORMACION SOBRE AGENCIAS QUE OFRECEN SERVICIOS LEGALES A PERSONAS QUE CUMPLEN LOS REQUISITOS PARA UN HONORARIO REDUCIDO O NINGUN HONORARIO.

　　ASOCIACION DE LICENDIADOS DE FILADELFIA
　　SERVICO DE REFERENCA E INFORMACION LEGAL
　　One Reading Center
　　Filadelfia, Pennsylvania 19107
　　Telefono: (215) 238-1701"

4

Case ID: 240501584

<u>**AMENDED COMPLAINT – CIVIL ACTION**</u>

**1.**    Veterans Stadium served as the home of the Philadelphia Phillies from 1971 to 2004.



**2.**    During its existence, the field was covered in AstroTurf, a chemical product designed, manufactured, marketed, and sold by the Defendants in this case.  AstroTurf was first invented by Monsanto Company in the 1960s.

**3.**    Unbeknownst to the athletes who stepped on the field each day, AstroTurf, which was originally called "ChemGrass" by Monsanto, contained toxic levels of PFAS.

**4.**    PFAS, or per-and polyfluoroalkyl substances, are toxic and are known as "forever chemicals," and can cause brain, kidney, testicular, thyroid and other forms of cancer when absorbed by the human body.  PFAS includes PFOS and PFOA.

**5.**    PFAS are a family of human-made chemical compounds containing a carbon chain on which all hydrogen atoms are replaced by fluorine atoms. The carbon-fluorine bond is the

Case ID: 240501584

strongest bond in organic chemistry and the many carbon-fluorine bonds in PFAS impart their unique chemical properties.

6.      AstroTurf was, and is, a toxic cocktail of carcinogens, including PFAS, heavy metals, and ethylene oxide, or "EtO".

7.      David West, Darren Daulton, John Vukovich, John Kruk, Danny Jackson, Johnny Oates, Frank ("Tug") McGraw, and other Phillies left it all on the field day in and day out.

8.      For years, David West, Darren Daulton, John Vukovich, John Kruk, Danny Jackson Johnny Oates, Tug McGraw, and other Phillies spent thousands of hours entertaining Philadelphia sports fans on the AstroTurf at Veterans Stadium.

9.      But none of these players understood exactly what that field was doing to their bodies – unbeknownst to them, they were being exposed to toxic levels of carcinogens from the AstroTurf.

10.     Tragically, each one of them developed cancer as a direct result of their exposure to dangerous, toxic AstroTurf.

11.     David West, Darren Daulton, Johnny Oates, Tug McGraw and John Vukovich are five of six former Phillies who, after playing on the AstroTurf, contracted terminal brain cancer. They are five of at least ten professional baseball players who played on fields with AstroTurf and contracted terminal brain cancer, an astounding statistic.

12.     John Kruk contracted testicular cancer that prematurely ended his career.

13.     Danny Jackson contracted thyroid cancer.

14.     Upon information and belief, Phillies who played on the AstroTurf at Veterans Stadium were more than **300%** more likely to contract brain cancer than average men in their demographic group.

6

Case ID: 240501584

15.     David West's, John Vukovich's, Johnny Oates', Tug McGraw's, Darren Daulton's deaths, and the cancers of John Kruk and Danny Jackson, were preventable. They were the result of prolonged exposure to PFAS and other carcinogens in the AstroTurf at Veterans Stadium.

16.     More than half a century ago, 3M knew of the health hazards and environmental risks posed by PFAS.

17.     Beginning in the 1940s, 3M produced PFAS by electrochemical fluorination. From the 1940s through the early 2000s, 3M was the primary manufacturer of PFAS in the United States. 3M manufactured PFAS as raw chemical materials for use in 3M products and products made by third parties, like AstroTurf.

18.     In or around 1951, DuPont began to produce and sell polytetrafluoroethylene ("PTFE"), a fluoropolymer. The production of PTFE requires PFOA as a processing aid, and results in the presence of PFOA in some PTFE products. DuPont marketed its PTFE under the trade name "Teflon." PTFE is a fluoropolymer (i.e., a plastic containing fluorine) used in a diverse range of applications, including as sprayable coating that resists heat, water, and oil; a lubricant; a coating for catheters and other medical equipment; and an oxidizer in flares—among many other uses.

19.     DuPont produced numerous other PFAS Products, and it marketed and sold PFAS products throughout the United States. DuPont also began producing PFOA for its own use and for sale in the early 2000s, after 3M ceased PFOA production. DuPont continued to manufacture, market, and sell PFOA until at least 2013.

20.     Like 3M, DuPont has known for decades of the health and environmental risks posed by PFAS.

Case ID: 240501584

21.    3M and DuPont were the only companies to manufacture PFOA in the United States.

22.    The DuPont Defendants and Defendant 3M, the leading manufacturers of PFAS, knew for decades the dangers that PFAS posed, including the significant risks to human health, yet Defendants actively and fraudulently concealed this information from the public and continued manufacturing, distributing, and selling PFAS products.

23.    Defendants concealed the dangers of PFAS from consumers and the public even as their own research showed that the normal use of PFAS would create risks to public health, Defendants publicly denied, downplayed, and distorted the risks posed by PFAS.

24.    Defendants, including the DuPont Defendants and Defendant 3M, knew or should have known that the ordinary use of its PFAS products would injure those exposed to the products.

25.    Defendants, who were the designers, manufacturers, marketers, sellers, and distributors of AstroTurf to Veterans Stadium, knew for decades that their AstroTurf contained PFAS, yet Defendants actively and fraudulently concealed this information from the players and Plaintiffs in this case.

26.    Testing first publicly disclosed in March of 2023 has revealed that at all relevant times, the AstroTurf at Veterans Stadium contained toxic levels of PFAS, including PFOS and PFOA.

27.    Upon information and belief, Defendants always knew that their product was manufactured with toxic PFAS chemicals.

28.    PFAS' human toxicity and causative link to fatal cancers has been well documented for decades. Defendants knew or should have known that dating back to the mid-20th century, AstroTurf contained PFAS and that PFAS is highly toxic and indeed carcinogenic.

Case ID: 240501584

29.    IARC, the International Agency for Research on Cancer, has classified PFOA as carcinogenic to humans.

30.    In April of 2024, the EPA designated PFOA and PFOS as hazardous substances.

31.    Defendants knew or should have known that by supplying PFAS-laden AstroTurf to Veterans Stadium, they were exposing Phillies players like David West, Darren Daulton, John Vukovich, John Kruk, Johnny Oates, Tug McGraw, Danny Jackson, and others to unacceptably dangerous levels of carcinogens on a near daily basis.   However, Defendants fraudulently concealed their knowledge of the danger posed by AstroTurf from the players, including Plaintiffs, and the public at large.

32.    As a direct result of the Defendants' conduct, David West, Darren Daulton, Johnny Oates, Tug McGraw, and John Vukovich withered away and died of brain cancer, and John Kruk's and Danny Jackson's playing careers were ravaged by their cancer diagnoses.

9

### *DAVID WEST*



**33.** David West was a left-handed pitcher who played for the Philadelphia Phillies at Veterans Stadium during the 1993, 1994, 1995, and 1996 seasons. David pitched for the Phillies during the 1993 World Series.

**34.** During the 1993 season, David West and the Phillies had 81 games at Veterans Stadium, accounting for hundreds of hours that David West spent on the AstroTurf at the Stadium.

**35.** During the 1994 season, David West and the Phillies had 60 games at Veterans Stadium, accounting for hundreds of hours that David West spent on the AstroTurf at the Stadium.

**36.** During the 1995 season, David West and the Phillies had 72 games at Veterans Stadium, accounting for hundreds of hours that David West spent on the AstroTurf at the Stadium.

**37.** During the 1996 season, David West and the Phillies had 81 games at Veterans Stadium, accounting for hundreds of hours that David West spent on the AstroTurf at the Stadium.

Case ID: 240501584

38.    On May 14, 2022, at only 57 years of age, David West died because of glioblastoma, after suffering a horrific, nearly year-long battle with the disease.

39.    David West's cancer was proximately caused by his prolonged, extended exposure to PFAS in the Veterans Stadium AstroTurf.

*DARREN DAULTON*



40.    Darren Daulton was a catcher who played for the Philadelphia Phillies at Veterans Stadium in 1983 and from 1985 to 1997.

41.    Darren Daulton was a three time All Star, a 1997 World Series Champion, and the 1992 winner of the Silver Slugger Award.

42.    Darren Daulton played in hundreds of games at Veterans Stadium accounting for thousands of hours of exposure to the toxic levels of PFAS in the Stadium's AstroTurf.

43.    On August 6, 2017, at only 55 years of age, Darren Daulton died because of glioblastoma, after suffering a horrific, nearly four year-long battle with the disease.

11

Case ID: 240501584

*JOHN VUKOVICH*



44.      John Vukovich was an infielder, manager, and coach who played for the Philadelphia Phillies from 1970 to 1971 and 1976 to 1981, managed the Phillies in 1988, and coached the Phillies from 1988 to 2004.

45.      John Vukovich played, managed, and coached hundreds of games at Veterans Stadium accounting for thousands of hours of exposure to the toxic levels of PFAS in the Stadium's AstroTurf.

Case ID: 240501584

46.    In 2001, John Vukovich was first diagnosed with brain cancer. After having surgery, he returned to the Phillies coaching staff.  Tragically, in 2006, his brain cancer recurred and he died at age 59 on March 8, 2007.

*JOHN KRUK*



47.    John Kruk is a first basemen and outfielder who played for the Philadelphia Phillies at Veterans Stadium from 1989 to 1994.

48.    John Kruk was a three time All Star, in 1991, 1992, and 1993.

49.    John Kruk played in hundreds of games at Veterans Stadium accounting for thousands of hours of exposure to the toxic levels of PFAS in the Stadium's AstroTurf.

13

Case ID: 240501584

50.     Sadly, during Spring Training in 1994, John Kruk was diagnosed with testicular cancer, which dramatically reduced his ability to sign with new Major League teams when he entered free agency and handicapped his career trajectory.  He went on to retire at the end of the 1995 season.

### *JOHNNY OATES*



51.     Johnny Oates was a catcher who played for the Philadelphia Phillies at Veterans Stadium during 1975 and 1976 seasons. He helped the Phillies win the 1976 National League Eastern Division pennant.

52.     He was the pinch hitter in the National League Championship Series.

14

Case ID: 240501584

**53.**    Johnny Oates played in dozens of games at Veterans Stadium accounting for hundreds of hours of exposure to the toxic levels of PFAS in the Stadium's AstroTurf.

**54.**    Johnny Oates then played for the Los Angeles Dodgers and New York Yankees, appearing in two World Series.

**55.**    He went on to manage and coach in the major leagues for many seasons.

**56.**    He was diagnosed with brain cancer in October 2001, ending his career as a major-league manager.

**57.**    Tragically, after fighting the glioblastoma for three years, Johnny Oates died on Christmas Eve in 2004, at only 58 years old.

15

Case ID: 240501584

*TUG MCGRAW*



58.    Tug McGraw was a relief pitcher who played for the Philadelphia Phillies at Veterans Stadium from 1975 to 1984, over 10 years.

59.    Tug McGraw played in hundreds of games at Veterans Stadium accounting for thousands of hours of exposure to the toxic levels of PFAS in the Stadium's AstroTurf.

60.    As a pitcher, he clinched the Phillies' first World Series Championship in 1980.

61.    In 1999, he was inducted into the Philadelphia Baseball Wall of Fame.

62.    In 2003, McGraw was still continuing his work with the Phillies as an instructor during spring training when he was diagnosed with brain cancer.

Case ID: 240501584

**63.**     He died less than a year later on January 5, 2004, at only 59 years of age because of glioblastoma.

### *DANNY JACKSON*



**64.**     Danny Jackson was a left-handed pitcher who played for the Philadelphia Phillies at Veterans Stadium from 1993 to 1994.

**65.**     Danny Jackson was a two-time All Star, in 1988 and 1994, and a two-time World Series champion, in 1985 and 1990.

**66.**     Danny Jackson played in dozens of games at Veterans Stadium accounting for hundreds of hours of exposure to the toxic levels of PFAS in the Stadium's AstroTurf.

17

Case ID: 240501584

67.     Danny Jackson also played for the Kansas City Royals from 1983 to 1987, where the stadium also featured the same Monsanto AstroTurf at issue in this case.

68.     In December of 1994, Danny was tragically diagnosed with thyroid cancer.

## THE PARTIES

69.     Plaintiff, Jennifer West, is an adult individual and citizen of the state of Tennessee, with an agent for service of process located at the above captioned address.

70.     Jennifer West was, at all relevant times, the lawfully wedded wife of David West, and is now David's widow.

71.     Jennifer West brings this suit as the Administratrix of the Estate of David West, on her own behalf and on behalf of all statutory beneficiaries, and as personal representative of the Estate of David West.

72.     At the time of his death, and at all relevant times, David West was an adult individual and resident of the State of Tennessee.

73.     No other actions were commenced during David West's life in connection with the events that caused his death.

74.     Pursuant to 42 Pa. C.S.A. § 8301(b), David West's beneficiaries are:

    a.  Jennifer West (wife);

    b.  David Lee West, Jr. (son); and

    c.  Casey Christine West (daughter).

75.     Plaintiff, Amanda Daulton, is an adult individual and resident of the State of Florida, with an agent for service of process at the above-captioned address.

76.     Amanda Daulton was, at all relevant times, the lawfully wedded wife of Darren Daulton, and is now Darren's widow.

Case ID: 240501584

77.     Amanda Daulton brings this suit as the Administratrix of the Estate of Darren Daulton, on her own behalf and on behalf of all statutory beneficiaries, and as personal representative of the Estate of Darren Daulton.

78.     At the time of his death, and at all relevant times, Darren Daulton was an adult individual and resident of the State of Florida.

79.     No other actions were commenced during Darren Daulton's life in connection with the events that caused his death.

80.     Pursuant to 42 Pa. C.S.A. § 8301(b), Darren Daulton's beneficiaries are:

   a) Amanda Daulton (wife);

   b) Zachary Daulton (son);

   c) Summer Daulton (daughter);

   d) Savannah Daulton (daughter); and

   e) Darren Daulton II (son).

81.     Plaintiffs, Nicole Stolarick and Vincent Vukovich are adult individuals and citizen of the State of New Jersey, with an agent for service of process at the above-captioned address.

82.     Nicole Stolarick and Vincent Vukovich were, at all relevant times, the children of John Vukovich.

83.     Nicole Stolarick and Vincent Vukovich bring this suit as the Co-Administrators of the Estate of John Vukovich, on their own behalf and on behalf of all statutory beneficiaries, and as personal representatives of the Estate of John Vukovich.

84.     At the time of his death, and at all relevant times, John Vukovich was an adult individual and resident of the State of New Jersey.

Case ID: 240501584

85.     No other actions were commenced during John Vukovich's life in connection with the events that caused his death.

86.     Pursuant to 42 Pa. C.S.A. § 8301(b), John Vukovich's beneficiaries are:

   a)  Nicole Stolarick (daughter); and

   b)  Vincent Vukovich (son).

87.     John and Melissa Kruk are adult individuals and citizens of the State of Florida, with an agent for service of process located at the above-captioned address.

88.     At all relevant times, Melissa Kruk was and is the lawfully wedded wife of John Kruk.

89.     Plaintiff, Gloria Oates, is an adult individual and citizen of the State of Virginia, with an agent for service of process at the above-captioned address.

90.     Gloria Oates was, at all relevant times, the lawfully wedded wife of Johnny Oates, and is now Johnny's widow.

91.     Gloria Oates brings this suit as the Administratrix of the Estate of Johnny Oates, on her own behalf and on behalf of all statutory beneficiaries, and as personal representative of the Estate of Johnny Oates.

92.     At the time of his death, and at all relevant times, Johnny Oates was an adult individual and resident of the State of Virginia.

93.     No other actions were commenced during Johnny Oates' life in connection with the events that caused his death.

94.     Pursuant to 42 Pa. C.S.A. § 8301(b), Johnny Oates; beneficiaries are:

   f)  Gloria Oates (wife);

   g)  Andrew Oates (son);

20

Case ID: 240501584

h)  Lori Everhart (daughter); and

i)  Jennifer Oates (daughter).

95.    Plaintiff, Timothy McGraw is an adult individual and citizen of the State of Tennessee, with an agent for service of process at the above-captioned address.

96.    Plaintiff, Jennifer Brusstar is an adult individual and citizen of the State of California, with an agent for service of process at the above-captioned address.

97.    Timothy McGraw was, at all relevant times, the child of Tug McGraw.

98.    Timothy McGraw and Jennifer Brusstar bring this suit as the Co-Administrators of the Estate of Tug McGraw, on their own behalf and on behalf of all statutory beneficiaries, and as personal representatives of the Estate of Tug McGraw.

99.    At the time of his death, and at all relevant times, Tug McGraw was an adult individual and resident of the Commonwealth of Pennsylvania.

100.    No other actions were commenced during Tug McGraw's life in connection with the events that caused his death.

101.    Pursuant to 42 Pa. C.S.A. § 8301(b), Tug McGraw's beneficiaries are:

c)  Mark McGraw (son); and

d)  Matthew McGraw (son);

e)  Cari Velardo (daughter);

f)  Timothy McGraw (son).

102.    Danny Jackson and Barbara Jackson are adult individuals and citizens of the State of Kansas, with an agent for service of process located at the above-captioned address.

103.    At all relevant times, Barbara Jackson was and is the lawfully wedded wife of Danny Jackson.

Case ID: 240501584

104.    Defendant, Alco Chemical Manufacturing Company, is a corporation or other business entity organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business located at the above captioned address.

105.    At all relevant times, Defendant Alco Chemical Manufacturing Company was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency, service and/or employment with Defendant Alco Chemical Manufacturing Company.

106.    Defendant Alco Chemical Company has purposely established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous, and systematic business activities in Pennsylvania, and regularly conducts business in Philadelphia County.

107.    Defendant, Alco Chemical Company, is a corporation or other business entity organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business located at the above captioned address.

108.    At all relevant times, Defendant Alco Chemical Company was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency, service and/or employment with Defendant Alco Chemical Company.

109.    Defendant Alco Chemical Company has purposely established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous, and systematic business activities in Pennsylvania, and regularly conducts business in Philadelphia County.

Case ID: 240501584

110.    Defendant, Alco Standard Corporation, is a corporation or other business entity organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business located at the above captioned address.

111.    At all relevant times, Defendant Alco Standard Corporation was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency, service and/or employment with Defendant Alco Standard Corporation.

112.    Defendant Alco Standard Corporation has purposely established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous, and systematic business activities in Pennsylvania, and regularly conducts business in Philadelphia County

113.    At all relevant times, Defendant Alco Standard Corporation designed, tested, manufactured, marketed, sold, and/or placed component parts of AstroTurf, including Alcogum, into the stream of commerce, including in Pennsylvania and including in Philadelphia County.

114.    Alcogum is a sodium polyacrylate viscosity control agent which was used to create the rubber backing for AstroTurf.  Alcogum was originally manufactured and sold by Defendants Alco Chemical Manufacturing Company, Alco Chemical Corporation, and Alco Standard Corporation in Philadelphia, Pennsylvania.

115.    At all relevant times, Defendants Alco Chemical Manufacturing Company, Alco Chemical Corporation, and Alco Standard Corporation placed component parts of AstroTurf, including Alcogum, into the stream of commerce in Pennsylvania, which was intended to and in fact foreseeably resulted in the AstroTurf and component parts, including Alcogum, being used in Pennsylvania, and after being placed into the stream of commerce in Pennsylvania, caused harm and injury to Plaintiffs and their decedents in Pennsylvania.

Case ID: 240501584

116.    Defendant, Nouryon Chemicals LLC, is a corporation or other business entity organized and existing under the laws of the State of Delaware with its principal place of business located at the above captioned address.

117.    At all relevant times, Defendant Nouryon Chemicals LLC was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency, service and/or employment with Defendant Nouryon Chemicals LLC.

118.    Defendant Nouryon Chemicals LLC has purposely established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous, and systematic business activities in Pennsylvania, and regularly conducts business in Philadelphia County.

119.    Defendant, Nouryon Surface Chemistry LLC, is a corporation or other business entity organized and existing under the laws of the State of Delaware with its principal place of business located at the above captioned address.

120.    At all relevant times, Defendant Nouryon Surface Chemistry LLC was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency, service and/or employment with Defendant Nouryon Surface Chemistry LLC.

121.    Defendant Nouryon Surface Chemistry LLC has purposely established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous, and systematic business activities in Pennsylvania, and regularly conducts business in Philadelphia County.

122.    Defendant, Nouryon USA LLC, is a corporation or other business entity organized and existing under the laws of the State of Delaware with its principal place of business located at the above captioned address.

24

Case ID: 240501584

123.    At all relevant times, Defendant Nouryon USA LLC was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency, service and/or employment with Defendant Nouryon USA LLC.

124.    Defendant Nouryon USA LLC has purposely established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous, and systematic business activities in Pennsylvania, and regularly conducts business in Philadelphia County.

125.    Upon information and belief, Defendants Nouryon Chemicals LLC and/or Nouryon Surface Chemistry LLC and/or Nouryon USA LLC is/are the successor(s) in interest to Defendant Alco Chemical Manufacturing Company with respect to Alcogum, and the liabilities associated with Alcogum.

126.    Defendants Alco Chemical Manufacturing Company, Alco Chemical Corporation, and Alco Standard Corporation, Nouryon Chemicals LLC, Nouryon Surface Chemistry LLC, and Nouryon USA LLC are hereinafter collectively referred to as the "Nouryon Defendants."

127.    Defendant, AstroTurf Industries Inc., is a corporation or other business entity organized and existing under the laws of the State of Delaware with its principal place of business located at the above captioned address.

128.    At all relevant times, Defendant AstroTurf Industries Inc. was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency, service and/or employment with Defendant AstroTurf Industries Inc.

129.    Defendant AstroTurf Industries Inc. has purposely established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous, and

Case ID: 240501584

systematic business activities in Pennsylvania, and regularly conducts business in Philadelphia County.

130.    At all relevant times, Defendant AstroTurf Industries Inc. designed, tested, manufactured, marketed, sold, and/or placed AstroTurf into the stream of commerce, including in Pennsylvania and including in Philadelphia County.

131.    At all relevant times, Defendant AstroTurf Industries Inc. placed AstroTurf into the stream of commerce in Pennsylvania, which was intended to and in fact foreseeably resulted in the AstroTurf being used in Pennsylvania, and after being placed into the stream of commerce in Pennsylvania, caused harm and injury to Plaintiffs and their decedents in Pennsylvania.

132.    Defendant AstroTurf Industries Inc. is and was at all relevant times registered to do business in the Commonwealth of Pennsylvania.

133.    Defendant, 3M Company, is a corporation or other business entity organized and existing under the laws of the State of Delaware, authorized to conduct business in Pennsylvania, with its headquarters and principal place of business located at the above captioned address.

134.    At all relevant times, Defendant 3M Company was acting by and through its agents, servants and/or employees who were acting within the course and scope of their agency, service and/or employment with Defendant 3M.

135.    Defendant 3M Company has purposely established significant contacts in Pennsylvania, and has carried out, and continues to carry out, substantial, continuous, and systematic business activities in Pennsylvania, and regularly conducts business in Philadelphia County.

Case ID: 240501584

136.    At all relevant times, Defendant 3M Company designed, tested, manufactured, marketed, promoted, distributed, and/or sold PFAS into the stream of commerce, including in Pennsylvania and Philadelphia County.

137.    At all relevant times, Defendant 3M Company placed PFAS into the stream of commerce in Pennsylvania, which was intended to and in fact foreseeably resulted in PFAS being used in Pennsylvania, and after being placed into the stream of commerce in Pennsylvania, caused harm and injury to Plaintiffs and their decedents in Pennsylvania.

138.    Defendant 3M Company is hereinafter referred to as the "Defendant 3M."

139.    Defendant, EIDP Inc. d/b/ and/or f/k/a E.I. Du Pont de Nemours and Company ("Old DuPont"), is a corporation or other business entity organized and existing under the laws of the State of Delaware, with an agent for service of process located at the above-captioned address.

140.    In 2015, facing billions of dollars in liabilities arising from its use of PFAS, Defendant EIDP Inc. d/b/a and/or f/k/a E.I. Du Pont de Nemours and Company began engaging in a series of transactions meant to distance its valuable assets from the liability created by its actions in unleashing and marketing these products to the public, ultimately resulting in the creation of Du Pont de Nemours, Inc., d/b/a DuPont ("New DuPont") and Corteva, Inc.

141.    Defendant, Du Pont de Nemours, Inc., d/b/a DuPont ("New DuPont"), is a corporation or other business entity organized and existing under the laws of the State of Delaware, authorized to conduct business in Pennsylvania, with an agent for service of process located at the above-captioned address.

142.    In 2015, Old DuPont created New DuPont to facilitate a merger with third party The Dow Chemical Company and serve as a holding company for the combined assets of the two

27

companies. In connection with a series of subsequent transactions in 2019, New DuPont assumed certain Old DuPont liabilities – including those relating to PFAS.

143.    In 2019, New DuPont spun off a new, publicly traded company, Corteva, which currently holds Old DuPont as a subsidiary. In connection with the transfer, Corteva assumed certain of Old DuPont's liabilities – including those relating to PFAS.

144.    Defendant Corteva, Inc., a corporation or other business entity organized and existing under the laws of the State of Delaware, authorized to conduct business in Pennsylvania, with a principal place of business at the above-captioned address.

145.    Defendants EIDP Inc. d/b/a and/or f/k/a E.I. Du Pont de Nemours and Company, Du Pont de Nemours, Inc., d/b/a DuPont, and Corteva, Inc. are hereinafter collectively referred to as the "DuPont Defendants."

146.    At all relevant times, the DuPont Defendants were acting by and through their agents, servants and/or employees who were acting within the course and scope of their agency, service and/or employment with the DuPont Defendants.

147.    The DuPont Defendants have purposely established significant contacts in Pennsylvania, and have carried out, and continue to carry out, substantial, continuous, and systematic business activities in Pennsylvania, and regularly conducts business in Philadelphia County.

148.    At all relevant times, the DuPont Defendants manufactured, marketed, promoted, distributed, and/or sold PFAS and PFAS-containing products throughout the United States, including in Pennsylvania and Philadelphia County.

Case ID: 240501584

149.    The DuPont Defendants designed, tested, manufactured, marketed, promoted, distributed, and/or sold PFAS and PFAS-containing products into the stream of commerce, including in Pennsylvania and Philadelphia County.

150.    At all relevant times, the DuPont Defendants placed and PFAS and PFAS-containing products into the stream of commerce in Pennsylvania, which was intended to and in fact foreseeably resulted in PFAS and PFAS-containing products being used in Pennsylvania, and after being placed into the stream of commerce in Pennsylvania, caused harm and injury to Plaintiffs and their decedents in Pennsylvania.

151.    Defendants John Does 1-2 are currently unknown individuals and/or corporations who, at all relevant times designed, manufactured, tested, distributed, marketed, sold, and/or supplied the AstroTurf and/or NexTurf (and/or its component parts, including crumb rubber infill) at Veterans Stadium, which contained toxic levels of PFAS and which was a proximate cause of and/or a substantial factor in causing Plaintiffs' cancer.

152.    A reasonable and diligent search was conducted to determine the actual name/identity of John Does 1-2.

153.    Pursuant to Pennsylvania Rule of Civil Procedure 2005, Defendants John Does 1-2 are currently unidentified, fictitious defendants added Doe designated to this action where their actual name/identity is unknown despite a reasonable and diligent search.

154.    Plaintiff reserves the right to amend this Complaint and name said unknown individuals and/or entities, John Does 1-2, as defendants pursuant to Pennsylvania Rules of Civil Procedure 2005 and 1033.

155.    At all relevant times, Defendant 3M, and the DuPont Defendants, designed, manufactured, tested, distributed, marketed, sold and/or supplied PFAS and PFAS-containing

29

Case ID: 240501584

products for use by third parties. Defendants knew or should have known that PFAS were dangerously in that they were harmful and toxic.

156.    Importantly, Defendants knew for much of this time, during which they profited immensely from the sale of their products, that PFAS posed risks to people' heath, *inter alia.* Defendants knew of these risks, knew consumer products could not contain PFAS, and as early as the 1970s knew that their PFAS chemistry was already building up in the blood of Americans, including Plaintiffs. Nonetheless, Defendants concealed these substantial risks from consumers, and for decades, even affirmatively claimed their products as "safe."

157.    At all relevant times, Defendants acting by and through their agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers, distributors, subsidiaries, sister corporations, parent companies, successor corporations and/or predecessor corporations. designed, manufactured, tested, distributed, marketed, sold and/or supplied AstroTurf to Veterans Stadium in Philadelphia.  Defendants knew or should have known that their AstroTurf product was dangerously defective in that it contained toxic levels of PFAS, a known carcinogen. David West, Darren Daulton, John Vukovich, Johnny Oates, Tug McGraw, Danny Jackson, and John Kruk all developed cancer as a direct and proximate result of repeated and prolonged exposure to the AstroTurf, by means of direct and/or indirect contact, inhalation and/or dermal absorption.  As a result of that exposure, Plaintiffs' risk of developing certain cancers, including glioblastoma and testicular cancer, became unnecessarily and significantly higher than the average person.

Case ID: 240501584

## JURISDICTION AND VENUE

158.    At all relevant times, the Nouryon Defendants had, and continue to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that they have purposefully availed itself of the laws of the Commonwealth and expect to both sue and be sued in Pennsylvania.  Additionally, the Nouryon Defendants' presence in the Commonwealth of Pennsylvania satisfies the due process requirements for Pennsylvania courts to exercise jurisdiction over it.  The Nouryon Defendants have consented to the exercise of jurisdiction over them by Pennsylvania courts by registering to and conducting business in the Commonwealth of Pennsylvania.

159.    At all relevant times, the Nouryon Defendants have transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including Alcogum products, in the Commonwealth of Pennsylvania for the purpose of realizing pecuniary benefit from those sales and distributions; (2) engaging in business in the Commonwealth of Pennsylvania; and/or (3) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

160.    At all relevant times, AstroTurf Industries Inc. had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and be sued in Pennsylvania.  Additionally, AstroTurf Industries Inc.'s presence in the Commonwealth of Pennsylvania satisfies the due process requirements for Pennsylvania courts to exercise jurisdiction over it.  AstroTurf Industries Inc. have consented to the exercise of jurisdiction over them by Pennsylvania courts by registering to and conducting business in the Commonwealth of Pennsylvania.

Case ID: 240501584

161.    At all relevant times, AstroTurf Industries Inc. has transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including AstroTurf products, in the Commonwealth of Pennsylvania for the purpose of realizing pecuniary benefit from those sales and distributions; (2) engaging in business in the Commonwealth of Pennsylvania; and/or (3) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

162.    At all relevant times, Defendant 3M has, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and expects to both sue and be sued in Pennsylvania.  Additionally, Defendant 3M's presence in the Commonwealth of Pennsylvania satisfies the due process requirements for Pennsylvania courts to exercise jurisdiction over it.  Defendant 3M has consented to the exercise of jurisdiction over them by Pennsylvania courts by registering to and conducting business in the Commonwealth of Pennsylvania.

163.    At all relevant times, Defendant 3M has transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including PFAS products, in the Commonwealth of Pennsylvania for the purpose of realizing pecuniary benefit from those sales and distributions; (2) engaging in business in the Commonwealth of Pennsylvania; and/or (3) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

164.    At all relevant times, the DuPont Defendants had, and continues to have, regular and systematic contact with and conducts business in and from the Commonwealth of Pennsylvania, such that it has purposefully availed itself of the laws of the Commonwealth and

32

Case ID: 240501584

expects to both sue and be sued in Pennsylvania. Additionally, the DuPont Defendants' presence in the Commonwealth of Pennsylvania satisfies the due process requirements for Pennsylvania courts to exercise jurisdiction over it. The DuPont Defendants have consented to the exercise of jurisdiction over them by Pennsylvania courts by registering to and conducting business in the Commonwealth of Pennsylvania.

165.    At all relevant times, the DuPont Defendants have transacted business in the Commonwealth of Pennsylvania including by: (1) selling and distributing products and merchandise, including PFAS products, in the Commonwealth of Pennsylvania for the purpose of realizing pecuniary benefit from those sales and distributions; (2) engaging in business in the Commonwealth of Pennsylvania; and/or (3) owning, using, and/or possessing real property situated in the Commonwealth of Pennsylvania.

166.    Venue is proper in Philadelphia County under Pennsylvania Rule of Civil Procedure 2179 because (1) one or more of the defendants has a registered office and/or principal place of business in Philadelphia County, (2) one or more of the defendants regularly conducts business in Philadelphia County, and (3) the cause of action in this case arose in Philadelphia County, as Plaintiffs were injured in Philadelphia County and one or more transactions or occurrences giving rise to this cause of action took place in Philadelphia County.

## LACK OF FEDERAL SUBJECT MATTER JURISDICTION

167.    This case is not removable to federal court because Plaintiffs do not make or allege any claims that implicate a federal question.

168.    Additionally, one or more of the defendants are residents and citizens of the Commonwealth of Pennsylvania, namely Alco Chemical Manufacturing Company Inc., Alco Chemical Corporation, and Alco Standard Corporation. The Nouryon Defendants are also

33

considered forum defendants because they are headquartered in the Commonwealth of Pennsylvania.

**169.**    Any attempts to remove this case to federal court would be frivolous and without any legal basis.

## FACTS COMMON TO ALL COUNTS

**170.**    PFAS is a broad term that refers to per-and-polyfluoroalkyl substances.  These include PFOS and PFOA.

**171.**    3M developed PFOS and PFOA in the 1940s.

**172.**    In 1951, Old DuPont began manufacturing products containing PFOA that it purchased from 3M.

**173.**    Defendants marketed products containing harmful PFAS chemicals for over 70 years and were aware of the harmful effects of PFAS for over 50 years. Despite this knowledge, Defendants continued to market PFAS products and chemicals in Pennsylvania and elsewhere as safe, misrepresenting their environmental and biological risks, and concealing risk of harm from the public.

**174.**    As early as the 1950s, 3M knew that PFAS was toxic to humans and the environment.

**175.**    Like 3M, DuPont has known for decades of the health and environmental risks posed by PFAS.

**176.**    Despite its understanding of the hazards associated with the PFAS in its products, 3M suppressed scientific research on the hazards associated with them and mounted a campaign to control the scientific dialogue on the fate, exposure, analytics, effects to human health, and ecological risks of PFAS. Thus, 3M deceived others and hid the negative effects of PFAS.

34

Case ID: 240501584

177.    Despite its knowledge of the risks associated with exposures to its PFAS products, when 3M announced that it would phase out its PFOS, PFOA, and related products in 2000, it falsely asserted that its products were safe instead of disclosing what it knew about the substantial threat posed by PFOS and PFOA.

178.    3M did not disclose its knowledge and information to regulatory authorities or the public relating to 3M's PFAS products.

179.    Defendants, have had actual and/or constructive knowledge dating back to the 1950's that PFAS are toxic to humans.

    a)  In 1959, it was publicly known that a worker exposed to PFAS-laden products had died from inhalation of PFAS chemicals;
    b)  In 1961, chemical industry leaders learned that PFAS-laden products caused dangerously increased liver sizes in rats at low doses;
    c)  In 1970, chemical industry leaders learned that PFAS chemicals were highly toxic when inhaled and ingested;
    d)  In 1980, chemical industry leaders found PFAS in the blood of pregnant factory workers and their children;
    e)  In 1981, chemical industry leaders learned of birth defects amongst pregnant factory workers exposed to PFAS;
    f)  In 1988, chemical industry leaders linked PFAS to testicular adenomas in rats;
    g)  In 1991, it was publicly disclosed that PFAS posed a "likely risk to human health.";
    h)  In 1993, epidemiological studies were publicly disclosed showing the toxicity of PFAS to humans;
    i)  In 1994, chemical industry leaders learned that PFAS exposure was linked to prostate cancer;
    j)  In 2003, chemical industry leaders learned that PFAS exposure could cause hepatocellular adenoma in mice; and
    k)  In 2003, chemical industry leaders learned that PFAS exposure could cause fatal kidney and bladder cancer.

180.    Defendant 3M knew or should have known that the ordinary use of PFAS would injure those exposed to them.

181.    Defendant 3M knew or should have known that the ordinary use of PFAS, including PFOS and PFOA, by third parties would injure those exposed to them.

Case ID: 240501584

182.    The DuPont Defendants knew or should have known that the ordinary use of PFAS and PFAS-containing products would injure those exposed to them.

183.    The DuPont Defendants knew or should have known that the ordinary use of PFAS, including PFOS and PFOA, by third parties would injure those exposed to them.

184.    Despite this knowledge, Defendant 3M, and the DuPont Defendants actively and fraudulently concealed the toxicity of PFAS from the public, including Plaintiffs, and continues to actively and fraudulently conceal and deny such information to this day.

185.    Despite this knowledge, Defendant 3M and the DuPont Defendants continued to design, market, sell, and place into the stream of commerce their PFAS chemicals and products, continually exposing Plaintiffs to its danger and high toxicity.

186.    Despite this knowledge, Defendant 3M and the DuPont Defendants failed to warn Plaintiffs of the danger posed by PFAS.

187.    Prior to manufacturing, marketing, and selling AstroTurf, which AstroTurf Industries Inc. knew to be laden with PFAS, AstroTurf Industries Inc. knew or should have known of the human toxicity posed by PFAS, including PFOA and PFOS.

188.    Despite this knowledge, AstroTurf Industries Inc. actively and fraudulently concealed the toxicity of PFAS from the public, including Plaintiffs, and continues to actively and fraudulently conceal and deny such information to this day.

189.    Despite this knowledge, AstroTurf Industries Inc. continued to design, market, sell, and place into the stream of commerce their AstroTurf products, continually exposing Plaintiffs to its dangerous and highly toxic PFAS components.

190.    Despite this knowledge, AstroTurf Industries Inc. failed to warn Plaintiffs of the danger posed by their highly toxic AstroTurf products.

Case ID: 240501584

191.    However, Plaintiffs, and their beneficiaries, had no way of knowing that the AstroTurf at Veterans Stadium, to which they were regularly and continually exposed, contained toxic levels of PFAS and other dangerous and toxic chemicals, including Alcogum.  Defendants knew this information, yet failed to reveal it to Plaintiffs and indeed actively and fraudulently concealed it from Plaintiffs.

## CONTEMPORARY SCIENTIFIC AND MEDICAL LITERATURE HAS REVEALED THE HORRIFIC DANGERS POSED BY PFAS

192.    In approximately December of 2023, the International Agency for Research on Cancer ("IARC") explicitly categorized PFOA as Group 1, or carcinogenic to humans, and categorized PFOS as Group 2, or possibly carcinogenic to humans.

193.    IARC found that there was sufficient evidence showing PFOA caused cancer in experimental animals and strong mechanistic evidence that PFOA caused epigenetic alterations and immunosuppression in humans, as well as the fact that PFOA contained other carcinogenic properties.

194.    IARC also found that there was strong mechanistic evidence that PFOS caused epigenetic alterations and immunosuppression in humans, as well as the fact that PFOS contained other carcinogenic properties.

195.    In April of 2024, the EPA designated PFOA and PFOS as hazardous substances.

196.    Recent medical literature has laid out in extensive, public detail that PFAS, such as PFOA and PFOS are toxic to humans and carcinogenic.

197.     This literature has linked PFAS exposure to testicular, thyroid, and brain cancers.

37

198.    Sadly, Plaintiffs were unaware that their cancers were caused or could have been caused by exposure to PFAS because Defendants actively and fraudulently concealed from Plaintiffs the dangers of PFAS and that the AstroTurf at Veterans Stadium contained toxic levels of PFAS.

## MONSANTO'S DEVELOPMENT OF ASTROTURF

199.    Monsanto scientists originally developed AstroTurf in 1965.  The product was originally dubbed "ChemGrass" – short for chemical grass.

200.    AstroTurf was patented in 1967 under U.S. Patent number 3332828 and issued to Monsanto Industries:

38

Case ID: 240501584



July 25, 1967    J. M. FARIA ET AL    3,332,828
MONOFILAMENT RIBBON PILE PRODUCT
Filed Dec. 28, 1965

FIG. I.

FIG. 2.

FIG. 3.    FIG. 4.

FIG. 5.

INVENTORS
JAMES M. FARIA
ROBERT T. WRIGHT
BY Roy H. Massengill
ATTORNEY

See Monsanto Patent Application.

    **201.**   AstroTurf's formulation is particularly toxic and contains several chemicals which are known to be dangerous to humans.

Case ID: 240501584

202.    The very manufacturing process of AstroTurf poisons the product with toxic levels of PFAS, because the extrusion of the plastic 'blades' of grass requires the use of PFAS, including PFOS and PFOA.

203.    In addition, the backing of Monsanto's AstroTurf was formulated from "Alcogum," a sodium polyacrylate viscosity control agent.  Alcogum was, upon information and belief, manufactured by Defendant Alco Chemical Manufacturing Company Inc., for whom the Nouryon Defendants are the successor in interest.

204.    Alcogum has been designated in the United States as "known to cause cancer" as it contains Ethylene Oxide (EtO).

205.    The inclusion of Alcogum and its chemical components, which contain EtO, increased the toxicity of AstroTurf and increased the risk of contracting cancer to the players regularly exposed to AstroTurf at Veterans Stadium.

## INSTALLATION OF ASTROTURF AT VETERANS STADIUM

206.    The construction of Veterans Stadium, a new home for the Philadelphia Phillies, began in October of 1967.

207.    In December of 1969, the City of Philadelphia received a $1,400,000 bid from the Monsanto to install Monsanto's AstroTurf product at the Stadium.

208.    The bid included installing 140 square feet of AstroTurf, to be replaced regularly, and construction of a subsurface drainage system.

209.    In October of 1970, a Monsanto crew laid down the first layer of AstroTurf at the Stadium.  Monsanto engineers regularly traveled to Philadelphia to inspect the field and make repairs.

Case ID: 240501584

210.    On April 10, 1971, the Philadelphia Phillies played their first game at Veterans Stadium.  Unbeknownst to the players, they were being exposed to dangerously high levels of toxic carcinogens from Monsanto's AstroTurf.

211.    In 1977, Monsanto returned to Philadelphia to replace the AstroTurf at Veterans Stadium.

212.    The AstroTurf at Veterans Stadium would continue to be replaced, installed, inspected, and maintained by Monsanto through 1995.

213.    Thereafter, the city hired AstroTurf Industries Inc. to replace the turf at Veterans Stadium and relevel the asphalt layer below the turf carpet.

214.    AstroTurf Industries Inc. installed more AstroTurf at Veterans Stadium, which was again laden with toxic PFAS chemicals, continually exposing the players to known human carcinogens.

215.    In 2001, AstroTurf Industries Inc. installed NexTurf at Veterans Stadium.  Upon information and belief, NexTurf was again laden with toxic PFAS chemicals, continually exposing the players to known human carcinogens.

216.    From the first game the Phillies played at Veterans Stadium until the last game played there in 2003, the field was always covered in AstroTurf.  That AstroTurf contained dangerous levels of PFAS, exposed the players to fatal toxins, and caused and/or increased the risk that the players using the field would contract cancer and other diseases.

217.    Tragically, publicly reported information indicates that Phillies who played at Veterans Stadium were **300% more likely to contract brain cancer** than the average man in their demographic group.

41

Case ID: 240501584

## **FRAUDULENT CONCEALMENT**

218.    The running of the statute of limitations with respect to the Wrongful Death and Survival Act claims of the Estates of David West, Darren Daulton, John Vukovich, Johnny Oates, and Tug McGraw have been equitably tolled by reason of Defendants' fraudulent concealment and conduct, namely that Defendants knew that their AstroTurf products were laden with PFAS, knew that PFAS was toxic and carcinogenic to humans, and yet intentionally withheld that information from the public at large and Plaintiffs in particular.  Through its affirmative representations and omissions upon which Plaintiffs justifiably relied, Plaintiffs actively concealed from Plaintiffs the true risks associated with long term exposure to AstroTurf.

219.    The running of the statute of limitations with respect to the claims of John Kruk and Danny and Barbara Jackson has been equitably tolled by the Discovery Rule, and the fact that Plaintiffs had no way of knowing that the AstroTurf at Veterans Stadium contained toxic levels of PFAS, including PFOA and PFOS, and this information was kept from Plaintiffs by way of Defendants' active and fraudulent concealment of the same.

220.    As a result of Defendants' actions, Plaintiffs were unaware, and could not reasonable have known or have learned through reasonable diligence that they had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

221.    Defendants are estopped from relying on any statute of limitations defenses because of their concealment of the truth regarding the safety – or lack thereof – of AstroTurf.  Defendants were, at all relevant times, under a duty to disclose the true character, quality, and nature of AstroTurf because the product's toxicity was non-public information over which Defendants continue to have exclusive control.  Defendants knew that this information was not available to

42

Case ID: 240501584

Plaintiffs, Plaintiffs' medical providers and/or their health facilities, yet failed to disclose this information to the public.

222.    Defendants had the ability and did spend enormous amounts of money in furtherance of their purposes of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Plaintiffs and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent and identity of related health risks, and they were forced to rely on Defendants' representations.

223.    The Defendants' negligence, recklessness, fraudulent concealment, strict liability, and all other wrongful conduct as alleged throughout the entirety of this Complaint was a factual cause of and/or placed Plaintiff's decedent David West at an increased risk of harm for and/or was a substantial factor in causing and did in fact directly and proximately cause the severe, permanent and grievous personal injuries and damages to Plaintiff previously described herein which include:

   a) Fatal brain cancer;
   b) Multiple medical tests and procedures;
   c) Increased risk of developing brain cancer;
   d) Development of brain cancer;
   e) Multiple hospitalizations;
   f) Conscious physical pain and suffering;
   g) Conscious mental and psychological pain and suffering;
   h) Mental anguish, severe emotional distress, disfigurement, embarrassment, humiliation, depression, anxiety, and fear;
   i) Loss of life's pleasures;
   j) Medical expenses;
   k) Loss of income and wages;
   l) Past and future pecuniary losses and damages;
   m) Increased risk of harm; and
   n) All injuries and damages set forth in David West's medical records and otherwise permissible under Pennsylvania law.

224.    Defendants' negligence, recklessness, fraudulent concealment, strict liability, and all other wrongful conduct as alleged throughout the entirety of this Complaint was a factual cause

Case ID: 240501584

of and/or placed Plaintiff's decedent Darren Daulton at an increased risk of harm for and/or was a substantial factor in causing and did in fact directly and proximately cause the severe, permanent and grievous personal injuries and damages to Plaintiff previously described herein which include:

a) Fatal brain cancer;
b) Multiple medical tests and procedures;
c) Increased risk of developing brain cancer;
d) Development of brain cancer;
e) Multiple hospitalizations;
f) Conscious physical pain and suffering;
g) Mental and psychological pain and suffering;
h) Mental anguish, severe emotional distress, disfigurement, embarrassment, humiliation, depression, anxiety, and fear;
i) Loss of life's pleasures;
j) Medical expenses;
k) Loss of income and wages;
l) Pecuniary losses and damages;
m) Increased risk of harm; and
n) All injuries and damages set forth in Darren Daulton's medical records and otherwise permissible under Pennsylvania law.

225.     Defendants' negligence, recklessness, fraudulent concealment, strict liability, and all other wrongful conduct as alleged throughout the entirety of this Complaint was a factual cause of and/or placed Plaintiff's decedent John Vukovich at an increased risk of harm for and/or was a substantial factor in causing and did in fact directly and proximately cause the severe, permanent and grievous personal injuries and damages to Plaintiff previously described herein which include:

o) Fatal brain cancer;
p) Multiple medical tests and procedures;
q) Increased risk of developing brain cancer;
r) Development of brain cancer;
s) Multiple hospitalizations;
t) Conscious physical pain and suffering;
u) Mental and psychological pain and suffering;
v) Mental anguish, severe emotional distress, disfigurement, embarrassment, humiliation, depression, anxiety, and fear;
w) Loss of life's pleasures;
x) Medical expenses;
y) Loss of income and wages;

Case ID: 240501584

**z)** Pecuniary losses and damages;
**aa)** Increased risk of harm; and
**bb)** All injuries and damages set forth in John Vukovich's medical records and otherwise permissible under Pennsylvania law.

226.    Defendants' negligence, recklessness, fraudulent concealment, strict liability, and all other wrongful conduct as alleged throughout the entirety of this Complaint was a factual cause of and/or placed John Kruk at an increased risk of harm for and/or was a substantial factor in causing and did in fact directly and proximately cause the severe, permanent and grievous personal injuries and damages to Plaintiff previously described herein which include:

**a)** Testicular cancer;
**b)** Multiple medical tests and procedures;
**c)** Increased risk of developing testicular cancer;
**d)** Development of testicular cancer;
**e)** Need for future treatments, including, but not limited to, radiation, chemotherapy and/or stem cell transplant treatment, and the pain and suffering associated with such treatment;
**f)** Multiple hospitalizations;
**g)** Past and future conscious physical pain and suffering;
**h)** Past and future conscious mental and psychological pain and suffering;
**i)** Past and future mental anguish, severe emotional distress, disfigurement, embarrassment, humiliation, depression, anxiety, and fear;
**j)** Past and future loss of life's pleasures;
**k)** Past and future medical expenses;
**l)** Past and future loss of income and wages;
**m)** Past and future loss of earning capacity;
**n)** Past and future pecuniary losses and damages;
**o)** Increased risk of harm; and
**p)** All injuries and damages set forth in John Kruk's medical records and otherwise permissible under Pennsylvania law.

Case ID: 240501584

227.    The Defendants' negligence, recklessness, fraudulent concealment, strict liability, and all other wrongful conduct as alleged throughout the entirety of this Complaint was a factual cause of and/or placed Plaintiff's decedent Tug McGraw at an increased risk of harm for and/or was a substantial factor in causing and did in fact directly and proximately cause the severe, permanent and grievous personal injuries and damages to Plaintiff previously described herein which include:

a)  Fatal brain cancer;
b)  Multiple medical tests and procedures;
c)  Increased risk of developing brain cancer;
d)  Development of brain cancer;
e)  Multiple hospitalizations;
f)  Conscious physical pain and suffering;
g)  Conscious mental and psychological pain and suffering;
h)  Mental anguish, severe emotional distress, disfigurement, embarrassment, humiliation, depression, anxiety, and fear;
i)  Loss of life's pleasures;
j)  Medical expenses;
k)  Loss of income and wages;
l)  Past and future pecuniary losses and damages;
m) Increased risk of harm; and
n)  All injuries and damages set forth in Tug McGraw's medical records and otherwise permissible under Pennsylvania law.

228.    The Defendants' negligence, recklessness, fraudulent concealment, strict liability, and all other wrongful conduct as alleged throughout the entirety of this Complaint was a factual cause of and/or placed Plaintiff's decedent Johnny Oates at an increased risk of harm for and/or was a substantial factor in causing and did in fact directly and proximately cause the severe, permanent and grievous personal injuries and damages to Plaintiff previously described herein which include:

a)  Fatal brain cancer;
b)  Multiple medical tests and procedures;
c)  Increased risk of developing brain cancer;
d)  Development of brain cancer;

46

e) Multiple hospitalizations;
f) Conscious physical pain and suffering;
g) Conscious mental and psychological pain and suffering;
h) Mental anguish, severe emotional distress, disfigurement, embarrassment, humiliation, depression, anxiety, and fear;
i) Loss of life's pleasures;
j) Medical expenses;
k) Loss of income and wages;
l) Past and future pecuniary losses and damages;
m) Increased risk of harm; and
n) All injuries and damages set forth in Johnny Oates' medical records and otherwise permissible under Pennsylvania law.

229.    Defendants' negligence, recklessness, fraudulent concealment, strict liability, and all other wrongful conduct as alleged throughout the entirety of this Complaint was a factual cause of and/or placed Danny Jackson at an increased risk of harm for and/or was a substantial factor in causing and did in fact directly and proximately cause the severe, permanent and grievous personal injuries and damages to Plaintiff previously described herein which include:

a) Thyroid cancer;
b) Multiple medical tests and procedures;
c) Increased risk of developing thyroid cancer;
d) Development of thyroid cancer;
e) Need for future treatments, including, but not limited to, radiation, chemotherapy and/or stem cell transplant treatment, and the pain and suffering associated with such treatment;
f) Multiple hospitalizations;
g) Past and future conscious physical pain and suffering;
h) Past and future conscious mental and psychological pain and suffering;
i) Past and future mental anguish, severe emotional distress, disfigurement, embarrassment, humiliation, depression, anxiety, and fear;
j) Past and future loss of life's pleasures;
k) Past and future medical expenses;
l) Past and future loss of income and wages;
m) Past and future loss of earning capacity;
n) Past and future pecuniary losses and damages;
o) Increased risk of harm; and
p) All injuries and damages set forth in Danny Jackson's medical records and otherwise permissible under Pennsylvania law.

Case ID: 240501584

230.    Defendants are jointly and severally liable for the injuries and damages suffered by Plaintiffs.

231.    Plaintiffs aver that the injuries and damages alleged herein were caused solely by the acts of Defendants jointly and/or severally and/or individually and/or through their joint and individual agents, servants, workmen and/or employees as hereinbefore and hereinafter set forth.

## COUNT I: STRICT LIABILITY
### *PLAINTIFFS v. THE NOURYON DEFENDANTS*

232.    Plaintiffs incorporate all preceding paragraphs in this Complaint here by reference.

233.    The Nouryon Defendants designed, manufactured, assembled, installed, marketed, distributed, sold, supplied, and/or modified Alcogum, a critical component of the AstroTurf at Veterans Stadium from 1970 through at least 1994.  In short, the Nouryon Defendants were and are in the business of selling Alcogum products.

234.    The Nouryon Defendants had a nondelegable duty to place into the stream of commerce only those products that were free of defects and dangers and, further, to refrain from placing into the stream of commerce products that were in a defective condition, were unreasonably dangerous, that fail to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, and/or for which, on balance, the risks of their design outweigh the benefits of the same.

235.    The Nouryon Defendants expected their Alcogum products to reach consumers, users, and other persons coming into contact with them, including Plaintiffs, players on the Philadelphia Phillies, without substantial change in their condition from when those products were designed and manufactured.

48

Case ID: 240501584

236.     The Nouryon Defendants did, in fact, sell their Alcogum products to the Philadelphia Phillies and/or the City of Philadelphia knowing that those products would reach users and other persons coming into contact with them, including Plaintiffs, without substantial change in their condition from when those products were designed and manufactured.

237.     At all relevant times, those Alcogum products were in a defective condition, were unreasonably dangerous, failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, and/or on balance, the risks of their design outweighed the benefits of the same, once those products reached consumers, users, and other persons who came into contact with them, including Plaintiffs.

238.     At all times relevant to this litigation, Plaintiffs used and/or were exposed to AstroTurf products laden with Alcogum in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

239.     Plaintiffs could not have reasonably discovered the defects and risks associated with Alcogum before or at the time of exposure.

240.     The harm caused by Defendants' Alcogum products far outweighed their benefit, rendering the products dangerous to an extent beyond that which an ordinary consumer would contemplate. The Alcogum products were and are more dangerous than alternative products and Defendants could have avoided selling the Alcogum products in such a dangerous form. Indeed, at the time that Defendants placed these Alcogum products into the stream of commerce, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

241.     Placing these Alcogum products into the stream of commerce amounts to willful, wanton, and/or reckless conduct by Defendants.

Case ID: 240501584

242.    As a direct and proximate result of the defective design and manufacture of Alcogum products, Plaintiff David West developed brain cancer, Darren Daulton developed brain cancer, John Vukovich developed brain cancer, John Kruk developed testicular cancer, and Danny Jackson developed thyroid cancer, and each was injured catastrophically, including severe pain, suffering, disability, impairment, loss of enjoyment of life, loss of comfort, economic damages, and all the damages alleged throughout the entirety of this complaint.

243.    Therefore, as a result of the unreasonably dangerous condition of the Alcogum products, Defendants are strictly liable to Plaintiffs.

244.    The defects in the Alcogum products were substantial and contributing factors in causing Plaintiffs' grave injuries and/or increased the risk of harm of Plaintiffs' injuries, and, but for Defendants' misconduct and omissions, Plaintiffs would not have sustained their injuries.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against the Nouryon Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

### COUNT II: STRICT LIABILITY FOR DEFECTIVE MANUFACTURE AND DESIGN
### *PLAINTIFFS v. THE NOURYON DEFENDANTS*

245.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

246.    Plaintiffs bring this strict liability claim against the Nouryon Defendants for defective manufacture and design.

247.    At all relevant times, the Nouryon Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting of Alcogum products, which are defective and unreasonably dangerous to consumers, users, and other persons

Case ID: 240501584

coming into contact with them, including Plaintiffs, thereby placing Alcogum products into the stream of commerce. These actions were under the ultimate control and supervision of the Nouryon Defendants.

248.    At all times relevant to this litigation, the Nouryon Defendants designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Alcogum-containing products used by Plaintiffs, and/or to which Plaintiffs were exposed, as described above.

249.    At all times relevant to this litigation, the Nouryon Defendants' Alcogum products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Plaintiffs.

250.    At all times relevant to this litigation, the Nouryon Defendants' Alcogum products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Pennsylvania and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by the Nouryon Defendants.

251.    The Nouryon Defendants' Alcogum products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants, were defectively manufactured and designed by Defendants in that when they left the hands of the Defendants' manufacturers and/or suppliers, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

252.    The Nouryon Defendants' Alcogum products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed

51

by Defendants, were defective in manufacture, design, and formulation in that when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

253.    At all relevant times, the Nouryon Defendants' Alcogum products created significant risks to the health and safety of consumers and others who were exposed to the products that far outweigh the risks posed by other products on the market used for the same or similar purpose.

254.    Therefore, at all relevant times to this litigation, the Nouryon Defendants' Alcogum products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants, were defective in design and formulation, in one or more of the following ways:

a) When placed in the stream of commerce, the Alcogum products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect;

b) When placed in the stream of commerce, the Alcogum products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c) When placed in the stream of commerce, the Alcogum products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d) The Nouryon Defendants did not sufficiently test, investigate, or study their Alcogum products and, specifically, their levels of ethylene oxide, or EtO;

e) The Nouryon Defendants failed to test, investigate, or study their formulated Alcogum products;

f) Exposure to Alcogum and EtO-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the product;

g) The Nouryon Defendants knew or should have known at the time of marketing their Alcogum products that exposure to Alcogum and specifically, its levels of EtO, could result in cancer and other severe illnesses and injuries;

h) The Nouryon Defendants did not conduct adequate post-marketing surveillance of their Alcogum products; and

i) Defendants could have employed safer alternative designs and formulations.

Case ID: 240501584

255.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the Nouryon Defendants' Alcogum products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

256.    Plaintiffs could not have reasonably discovered the defects and risks associated with Alcogum or EtO-containing products before or at the time of exposure.

257.    The harm caused by Defendants' Alcogum products far outweighed their benefit, rendering Defendants' Alcogum products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' Alcogum products were and are more dangerous than alternative products and Defendants could have designed their Alcogum products to make them less dangerous. Indeed, at the time that the Nouryon Defendants designed their Alcogum products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

258.    The Nouryon Defendants' defective design of Alcogum amounts to willful, wanton, and/or reckless conduct by Defendants.

259.    As a direct and proximate result of the defective design and manufacture of Alcogum products, Plaintiff David West developed brain cancer, Darren Daulton developed brain cancer, John Vukovich developed brain cancer, John Kruk developed testicular cancer, and Danny Jackson developed thyroid cancer, and each was injured catastrophically, including severe pain, suffering, disability, impairment, loss of enjoyment of life, loss of comfort, economic damages, and all the damages alleged throughout the entirety of this complaint.

260.    Therefore, as a result of the unreasonably dangerous condition of their Alcogum products, the Nouryon Defendants are strictly liable to Plaintiffs.

Case ID: 240501584

261.    The defects in Defendants' Alcogum products were substantial and contributing factors in causing Plaintiffs' damages and/or increased the risk of harm of Plaintiffs' injuries, and, but for the Nouryon Defendants' misconduct and omissions, Plaintiffs would not have sustained these damages.

262.    As a direct and proximate result of the Nouryon Defendants placing their defective Alcogum products into the stream of commerce, Plaintiffs suffered the damages set forth herein.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against the Nouryon Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

### COUNT III: STRICT LIABILITY FOR FAILURE TO WARN
### *PLAINTIFFS v. THE NOURYON DEFENDANTS*

263.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

264.    Plaintiffs bring this strict liability claim against the Nouryon Defendants for failure to warn.

265.    At all relevant times, the Nouryon Defendants were engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and/or promoting Alcogum products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Alcogum and specifically, its EtO contents.  These actions were under the ultimate control and supervision of the Nouryon Defendants.

266.    The Nouryon Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and/or otherwise released into the stream

Case ID: 240501584

of commerce their Alcogum products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs and persons responsible for consumers like them, and the Nouryon Defendants therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of Alcogum and EtO-containing products and a duty to instruct on the proper, safe use of these products.

267.    At all times relevant to this litigation, the Nouryon Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that their Alcogum products did not cause users and consumers to suffer from unreasonable and dangerous risks.

268.    The Nouryon Defendants had a continuing duty to warn users, like Plaintiffs, of the dangers associated with Alcogum use and exposure, and a continuing duty to instruct on the proper, safe use of these products.

269.    The Nouryon Defendants, as manufacturers, sellers, and/or distributors of Alcogum and/or EtO-containing products, are held to the knowledge of experts in the field.

270.    At the time of manufacture and sale, the Nouryon Defendants could have provided warnings or instructions regarding the full and complete risks of Alcogum and EtO-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

271.    At all times relevant to this litigation, the Nouryon Defendants failed to investigate, study, test, or promote the safety of their Alcogum products. Defendants also failed to minimize the dangers to users and consumers of their Alcogum products and to those who would foreseeably use or be harmed by Defendants' products, including Plaintiffs.

Case ID: 240501584

272.    Despite the fact that the Nouryon Defendants knew or should have known that their Alcogum products posed a grave risk of harm, they failed to warn of the dangerous risks associated with their use and exposure.

273.    The dangerous propensities of their products and the carcinogenic characteristics of EtO, as described above, were known to the Nouryon Defendants, or scientifically knowable to the Nouryon Defendants through appropriate research and testing by known methods, at the time they distributed, supplied, and/or sold the product, and not known to end users and consumers, such as Plaintiffs.

274.    The Nouryon Defendants knew or should have known that their Alcogum and EtO-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and the Nouryon Defendants failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products.

275.    The Nouryon Defendants have wrongfully concealed information concerning the dangerous nature of Alcogum and its EtO content, and further made false and/or misleading statements concerning the safety of Alcogum and EtO.

276.    At all times relevant to this litigation, the Nouryon Defendants' Alcogum products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout Pennsylvania and the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by the Nouryon Defendants.

277.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of the Nouryon Defendants' Alcogum products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

56

278.    Plaintiffs could not have reasonably discovered the defects and risks associated with Alcogum or EtO-containing products before or at the time of their exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of the Nouryon Defendants.

279.    The Nouryon Defendants knew or should have known that the minimal warnings disseminated with their Alcogum products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including at professional sports stadiums.

280.    The information that the Nouryon Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled athletes such as Plaintiffs to utilize the products safely and with adequate protection. Instead, the Nouryon Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Alcogum, EtO, and the other toxic chemicals in Alcogum; continued to aggressively promote the efficacy of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and/or concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Alcogum and its chemical contents.

281.    To this day, the Nouryon Defendants have failed to adequately and accurately warn of the true risks associated with the use of and exposure to Alcogum and its carcinogenic EtO content.

Case ID: 240501584

282.    To this day, the Nouryon Defendants have failed to test, investigate, or study their Alcogum products.

283.    As a result of their inadequate warnings, the Nouryon Defendants' Alcogum products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed and sold by Defendants, and used by consumers like Plaintiffs.

284.    The Nouryon Defendants are liable to Plaintiffs for injuries caused by their failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their Alcogum products and the risks associated with the use of or exposure to Alcogum, EtO, and the other toxic chemical contents of Alcogum.

285.    The defects in the Nouryon Defendants' Alcogum products were substantial and contributing factors in causing Plaintiffs' damages, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained these damages.

286.    Had the Nouryon Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their Alcogum products, Plaintiffs could have avoided the risk of developing injuries as alleged herein.

287.    As a direct and proximate result of the Nouryon Defendants placing their defective Alcogum products into the stream of commerce and failing to warn Plaintiffs of the increased risk of cancer associated with the use of and/or exposure to Alcogum products as described herein, Plaintiffs have developed cancer and was injured catastrophically, including having been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of comfort, and economic damages, including for medical care and treatment. Plaintiffs will continue to incur damages associated with these Defendants' failures in the future.

Case ID: 240501584

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against the Nouryon Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

### COUNT IV: VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES ACT AND CONSUMER PROTECTION LAW, 73 P.S. SECTION 8201-1, ET SEQ. *PLAINTIFFS v. THE NOURYON DEFENDANTS*

288.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

289.    At all relevant times, the Nouryon Defendants knew or should have known of the unreasonably dangerous and carcinogenic nature of the use of and/or exposure to Alcogum, a key component of AstroTurf.

290.    At all relevant times, the Nouryon Defendants, through labeling, advertisements, public representations and marketing of Alcogum, intentionally used deception, fraud, false pretenses, false promises, misrepresentations, misleading statements, and unfair trade practices in order to mislead consumers and other manufacturers and product sellers that Alcogum products are safe for use.

291.    At all relevant times, the Nouryon Defendants also engaged in the concealment, suppression and/or omission of material facts in connection with the sale and/or advertisement of Alcogum products in trade or commerce. In particular, the Nouryon Defendants failed to disclose to the public that Alcogum is unsafe and poses serious health hazards, particularly various cancers, which Plaintiffs had.

292.    The Nouryon Defendants were aware of the hazardous risks posed by Alcogum and yet failed to inform the public of these risks through their advertisements, labeling, or other means

Case ID: 240501584

available to them. The Nouryon Defendants' failure to state material facts about Alcogum constitutes a violation of 73 P.S. §§ 201-1 et seq.

293.    At all relevant times, Plaintiffs were deceived by the Nouryon Defendants' intentional misrepresentations and omissions, including by the orchestrated claims made on or in television commercials, advertising materials, websites, and on product labels and packaging regarding the usage and safety of Alcogum.

294.    At all relevant times, Plaintiffs acted in reasonable reliance upon the Nouryon Defendants' unlawful trade practices, and had the Defendants not engaged in the deceptive conduct described herein, Plaintiffs would not have purchased Alcogum and/or would have protected themselves from exposure to Alcogum.

295.    As a direct and proximate result of the Nouryon Defendants' unlawful trade practices, Plaintiffs developed cancer and were injured catastrophically, having been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of comfort, and economic damages.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against the Nouryon Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

## COUNT V: NEGLIGENCE
### *PLAINTIFFS v. THE NOURYON DEFENDANTS*

296.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

Case ID: 240501584

297. At all relevant times, the Nouryon Defendants breached their duty to Plaintiffs and were otherwise negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing Alcogum products.

298. The Nouryon Defendants, directly or indirectly, caused Alcogum products to be purchased and/or used by Plaintiffs, including by having Alcogum included as a key chemical component of AstroTurf.

299. At all times relevant to this litigation, the Nouryon Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Alcogum products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

300. At all times relevant to this litigation, the Nouryon Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of Alcogum products. The Nouryon Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Alcogum and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Alcogum and, in particular, its EtO and other toxic chemical contents.

301. At all times relevant to this litigation, the Nouryon Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Alcogum and specifically, the carcinogenic properties of its chemical compounds.

302. Accordingly, at all times relevant to this litigation, the Nouryon Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to their Alcogum

Case ID: 240501584

products could cause Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

303.    The Nouryon Defendants knew or, in the exercise of reasonable care, should have known that Alcogum is more toxic than EtO alone and that safety studies on Alcogum, its "inert" ingredients were necessary to protect Plaintiffs from Alcogum.

304.    The Nouryon Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Alcogum were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to Alcogum and EtO-containing products.

305.    As such, the Nouryon Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Alcogum products, in that the Nouryon Defendants manufactured, produced, and sold defective products containing the chemical EtO, and other chemical contents, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

306.    The Nouryon Defendants failed to appropriately and adequately test Alcogum, and "inert" ingredients, and other chemical contents to protect consumers like Plaintiffs from Alcogum.

307.    Despite their ability and means to investigate, study, and test Alcogum products and to provide adequate warnings, the Nouryon Defendants have failed to do so. Indeed, the Nouryon Defendants have wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to Alcogum and EtO.

62

**308.**    The Nouryon Defendants' negligence included:

**a)** Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Alcogum products without thorough and adequate pre- and post-market testing;

**b)** Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Alcogum while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to EtO, and, consequently, the risk of serious harm associated with human use and exposure to Alcogum;

**c)** Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Alcogum products and EtO-containing products were safe for their intended use in professional sports stadiums;

**d)** Failing to test, investigate, or study Alcogum products;

**e)** Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or other chemical compounds contained within Alcogum, and the propensity of these ingredients to render Alcogum toxic, increase the toxicity of Alcogum, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Alcogum, and whether or not these ingredients and compounds were safe for use;

**f)** Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of Alcogum products so as to avoid the risk of serious harm associated with the prevalent use of Alcogum in AstroTurf at professional sports stadiums;

**g)** Failing to design and manufacture Alcogum products so as to ensure they were at least as safe and effective as other similar products on the market;

**h)** Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and/or be exposed to Alcogum products;

**i)** Failing to disclose to Plaintiffs, users, consumers, and the general public that the use of and exposure to Alcogum presented severe risks of cancer and other grave illnesses;

**j)** Failing to warn Plaintiffs, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative artificial grass available to Plaintiffs, and other users or consumers;

**k)** Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effect of Alcogum and EtO-containing products;

**l)** Representing that Alcogum products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended use;

**m)** Declining to make or propose any changes to Alcogum products' labeling or other promotional materials that would alert the consumers and the general public of the risks of Alcogum and EtO;

Case ID: 240501584

**n)** Advertising, marketing, and recommending the use of Alcogum and EtO-laden products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of or exposure to Alcogum and EtO;

**o)** Continuing to disseminate information to their consumers, which indicate or imply that Alcogum products are not unsafe for their intended use; and

**p)** Continuing the manufacture and sale of Alcogum products with the knowledge that the products were unreasonably unsafe and dangerous.

309. The Nouryon Defendants knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiffs, would suffer injuries as a result of the Nouryon Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Alcogum.

310. Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Alcogum or its EtO and other chemical contents.

311. The Nouryon Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, and will continue to suffer, as described herein.

312. The Nouryon Defendants' conduct, as described above, was reckless. The Nouryon Defendants regularly risk the lives of consumers and users of Alcogum products, including Plaintiffs, with full knowledge of the dangers of these products. The Nouryon Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs, with respect to the dangers of Alcogum about which the Nouryon Defendants knew but the public, including Plaintiffs, did not. The Nouryon Defendants' reckless conduct therefore warrants an award of punitive damages.

313. As a proximate result of the Nouryon Defendants' wrongful acts and omissions in placing defective Alcogum products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of the product, Plaintiffs developed cancer and were injured

Case ID: 240501584

catastrophically, having been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of comfort, and economic damages, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

**WHEREFORE**, Plaintiffs demands damages, including punitive damages, the Nouryon Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

### COUNT VI: BREACH OF IMPLIED WARRANTIES
### *PLAINTIFFS v. THE NOURYON DEFENDANTS*

**314.**    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

**315.**    At all relevant times, the Nouryon Defendants engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting their Alcogum products, which are defective and unreasonably dangerous to users, consumers and those in proximity to users, including Plaintiffs, thereby placing Alcogum products into the stream of commerce. These actions were under the ultimate control and supervision of the Nouryon Defendants.

**316.**    Before the time that Plaintiffs were exposed to the use of the aforementioned Alcogum products, the Nouryon Defendants impliedly warranted to their consumers and users— including Plaintiffs — that their Alcogum products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as a component of artificial turf/grass for professional sports stadiums.

**317.**    The Nouryon Defendants, however, failed to disclose that Alcogum has dangerous propensities when used as intended and that the use of and/or exposure to Alcogum and EtO-

Case ID: 240501584

containing products carries an increased risk of developing severe injuries and/or cancer, including Plaintiffs' damages.

318.    The Nouryon Defendants further failed to test, investigate, or study their Alcogum products.

319.    Upon information and belief, Plaintiffs reasonably relied upon the skill, superior knowledge and judgment of the Nouryon Defendants and upon their implied warranties that the Alcogum products were of merchantable quality and fit for their intended purpose or use.

320.    The Alcogum products were expected to reach and did in fact reach consumers, users and those in proximity to users, including Plaintiffs, without substantial change in the condition in which they were manufactured and sold by the Nouryon Defendants.

321.    At all relevant times, the Nouryon Defendants were aware that consumers, users, and those in proximity of users of their products, including Plaintiffs, would use Alcogum products as marketed by Defendants, which is to say that Plaintiffs were the foreseeable users/end users of Alcogum.

322.    The Nouryon Defendants intended that their Alcogum products be used in the manner in which Plaintiffs in fact used or were exposed to them and the Nouryon Defendants impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Alcogum was not adequately tested or researched.

323.    In reliance upon the Nouryon Defendants' implied warranty, Plaintiffs used or were in proximity to the use of Alcogum as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by the Nouryon Defendants.

324.    Plaintiffs could not have reasonably discovered or known of the risks of serious injury associated with Alcogum or EtO.

Case ID: 240501584

325.     The Nouryon Defendants breached their implied warranties to Plaintiffs in that their Alcogum products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Alcogum has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

326.     The harm caused by the Nouryon Defendants' Alcogum products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

327.     As a direct and proximate result of the Nouryon Defendants' wrongful acts and omissions, Plaintiffs suffered severe and permanent physical and emotional injuries and death.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against the Nouryon Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

## COUNT VII: FRAUDULENT CONCEALMENT
### *PLAINTIFFS v. THE NOURYON DEFENDANTS*

328.     Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

329.     The Nouryon Defendants are estopped from asserting a statute of limitations defense because they fraudulently concealed their wrongful conduct from Plaintiffs with the intent that Plaintiffs, as well as other consumers and users of Alcogum, would justifiability rely on such material representations, on which Plaintiffs and others similarly situated did justifiability rely.

330.     The Nouryon Defendants had actual knowledge that exposure to Alcogum and, specifically, its toxic chemical contents, including EtO, could result in cancer and other severe illnesses and injuries. The Nouryon Defendants knew or should have known that Alcogum is more

Case ID: 240501584

toxic than EtO alone and that safety studies of Alcogum, and/or Alcogum's "inert" ingredients, were necessary to protect Plaintiffs from Alcogum.

331.    The Nouryon Defendants failed to conduct adequate testing of Alcogum and its formulation.

332.    The Nouryon Defendants had actual knowledge of their misrepresentations, negligence, breach of warranties, and false, misleading, deceptive, and unconscionable conduct. Even so, the Nouryon Defendants perpetuated their wrongful conduct with the intent and fixed purpose of concealing their wrongs from Plaintiffs, and the public at large.

333.    Despite their knowledge that Alcogum is considerably more dangerous than EtO alone, the Nouryon Defendants continued to promote Alcogum as safe.

334.    Plaintiffs were unaware of the falsity of these representations, acted in actual and justifiable reliance on such material misrepresentations, and were injured as a direct and proximate result.

335.    Additionally, the Nouryon Defendants knowingly omitted material information and remained silent regarding said misrepresentations despite the fact that they had a duty to inform Plaintiffs, and the general public, of the inaccuracy of said misrepresentations, which omission constitutes a positive misrepresentation of material fact, with the intent that Plaintiffs and the general public would rely on the Nouryon Defendants' misrepresentations.

336.    Plaintiffs and the general public did, in fact, act in actual and justifiable reliance on Nouryon's representations, and Plaintiffs suffered damages as a result.

337.    The Nouryon Defendants, as the manufacturers and sellers of Alcogum, were in a position of superior knowledge and judgment regarding any potential risks associated with their products.

Case ID: 240501584

338.    The Nouryon Defendants committed constructive fraud by breaching one or more legal or equitable duties owed to Plaintiffs and the general public relating to Alcogum, said breach or breaches constituting fraud because of their propensity to deceive others or constitute an injury to public interests or public policy.

339.    In breaching their duties to Plaintiffs, the Nouryon Defendants used their position of trust as the manufacturer and/or distributor of Alcogum to increase sales of their products at the expense of informing Plaintiffs and the general public that use of or exposure to Alcogum carries the risk of serious illness, such as cancer and other similar illnesses.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against the Nouryon Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

## COUNT VIII: STRICT LIABILITY
### _PLAINTIFFS v. ASTROTURF INDUSTRIES INC._

399.    Plaintiffs incorporate all preceding paragraphs in this Complaint here by reference.

400.    AstroTurf Industries Inc. designed, manufactured, assembled, installed, marketed, distributed, sold, supplied, and/or modified the AstroTurf at Veterans Stadium from starting in approximately the 1990s.  In short, AstroTurf Industries Inc. were and are in the business of selling AstroTurf and NexTurf products.

401.    AstroTurf Industries Inc. had a nondelegable duty to place into the stream of commerce only those products that were free of defects and dangers and, further, to refrain from placing into the stream of commerce products that were in a defective condition, were unreasonably dangerous, that fail to perform as safely as an ordinary consumer would expect when

Case ID: 240501584

used in an intended or reasonably foreseeable manner, and/or for which, on balance, the risks of their design outweigh the benefits of the same.

402.    AstroTurf Industries Inc. expected their AstroTurf and NexTurf products to reach consumers, users, and other persons coming into contact with them, including Plaintiffs, players on the Philadelphia Phillies, without substantial change in their condition from when those products were designed and manufactured.

403.    AstroTurf Industries Inc. did, in fact, sell their AstroTurf and NexTurf products to the Philadelphia Phillies and/or the City of Philadelphia knowing that those products would reach users and other persons coming into contact with them, including Plaintiffs, without substantial change in their condition from when those products were designed and manufactured.

404.    At all relevant times, those AstroTurf and NexTurf products were in a defective condition, were unreasonably dangerous, failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, and/or on balance, the risks of their design outweighed the benefits of the same, once those products reached consumers, users, and other persons who came into contact with them, including Plaintiffs.

405.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to AstroTurf and NexTurf products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

406.    Plaintiffs could not have reasonably discovered the defects and risks associated with AstroTurf, NexTurf, and PFAS-containing products before or at the time of exposure.

407.    The harm caused by Defendants' AstroTurf and NexTurf products far outweighed their benefit, rendering the products dangerous to an extent beyond that which an ordinary consumer would contemplate. The AstroTurf and NexTurf products were and are more dangerous

70

Case ID: 240501584

than alternative products and Defendants could have avoided selling the AstroTurf and NexTurf products in such a dangerous form. Indeed, at the time that Defendants placed these AstroTurf and NexTurf products into the stream of commerce, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

408.    Placing these AstroTurf and NexTurf products into the stream of commerce amounts to willful, wanton, and/or reckless conduct by Defendants.

409.    As a direct and proximate result of the defective design and manufacture of AstroTurf and NexTurf products, Plaintiff David West developed brain cancer, Darren Daulton developed brain cancer, John Vukovich developed brain cancer, John Kruk developed testicular cancer, and Danny Jackson developed thyroid cancer, and each was injured catastrophically, including severe pain, suffering, disability, impairment, loss of enjoyment of life, loss of comfort, economic damages, and all the damages alleged throughout the entirety of this complaint.

410.    Therefore, as a result of the unreasonably dangerous condition of the AstroTurf and NexTurf products, Defendants are strictly liable to Plaintiffs.

411.    The defects in the AstroTurf and NexTurf products were substantial and contributing factors in causing Plaintiffs' grave injuries and/or increased the risk of harm of Plaintiffs' injuries, and, but for Defendants' misconduct and omissions, Plaintiffs would not have sustained their injuries.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against AstroTurf Industries Inc., individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

71

## COUNT IX: STRICT LIABILITY FOR DEFECTIVE
## MANUFACTURE AND DESIGN
### *PLAINTIFFS v. ASTROTURF INDUSTRIES INC.*

**412.** Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

**413.** Plaintiffs bring this strict liability claim against AstroTurf Industries Inc. for defective manufacture and design.

**414.** At all relevant times, AstroTurf Industries Inc. engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting of AstroTurf and NexTurf products, which are defective and unreasonably dangerous to consumers, users, and other persons coming into contact with them, including Plaintiffs, thereby placing AstroTurf and NexTurf products into the stream of commerce. These actions were under the ultimate control and supervision of AstroTurf Industries Inc..

**415.** At all times relevant to this litigation, AstroTurf Industries Inc. designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the AstroTurf and NexTurf products used by Plaintiffs, and/or to which Plaintiffs were exposed, as described above.

**416.** At all times relevant to this litigation, AstroTurf Industries Inc.' AstroTurf and NexTurf products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Plaintiffs.

**417.** At all times relevant to this litigation, the NexTurf Defendants' AstroTurf and NexTurf products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Pennsylvania and throughout the United States, including

72

Case ID: 240501584

Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by AstroTurf Industries Inc..

418.    AstroTurf Industries Inc.' AstroTurf and NexTurf products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants, were defectively manufactured and designed by Defendants in that when they left the hands of the Defendants' manufacturers and/or suppliers, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

419.    AstroTurf Industries Inc.' AstroTurf and NexTurf products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants, were defective in manufacture, design, and formulation in that when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

420.    At all relevant times, AstroTurf Industries Inc.' AstroTurf and NexTurf products created significant risks to the health and safety of consumers and others who were exposed to the products that far outweigh the risks posed by other products on the market used for the same or similar purpose.

421.    Therefore, at all relevant times to this litigation, AstroTurf Industries Inc.' AstroTurf and NexTurf products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants, were defective in design and formulation, in one or more of the following ways:

Case ID: 240501584

a) When placed in the stream of commerce, the AstroTurf and NexTurf products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect;

b) When placed in the stream of commerce, the AstroTurf and NexTurf products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c) When placed in the stream of commerce, the AstroTurf and NexTurf products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d) AstroTurf Industries Inc. did not sufficiently test, investigate, or study their AstroTurf and NexTurf products and, specifically, their levels of PFAS, including PFOS and PFOA;

e) AstroTurf Industries Inc. failed to test, investigate, or study their formulated AstroTurf and NexTurf products;

f) Exposure to AstroTurf, NexTurf and PFAS-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the product;

g) AstroTurf Industries Inc. knew or should have known at the time of marketing their AstroTurf and NexTurf products that exposure to AstroTurf and NexTurf and specifically, its levels of PFAS, could result in cancer and other severe illnesses and injuries;

h) AstroTurf Industries Inc. did not conduct adequate post-marketing surveillance of their AstroTurf and NexTurf products; and

i) Defendants could have employed safer alternative designs and formulations.

422. At all times relevant to this litigation, Plaintiffs used and/or were exposed to AstroTurf Industries Inc.' AstroTurf and NexTurf products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

423. Plaintiffs could not have reasonably discovered the defects and risks associated with AstroTurf and NexTurf or PFAS-containing products before or at the time of exposure.

424. The harm caused by Defendants' AstroTurf and NexTurf products far outweighed their benefit, rendering Defendants' AstroTurf and NexTurf products dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' AstroTurf and NexTurf products were and are more dangerous than alternative products and Defendants could have designed their AstroTurf and NexTurf products to make them less dangerous. Indeed, at the time

Case ID: 240501584

that the Defendants designed their AstroTurf and NexTurf products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

425.    AstroTurf Industries Inc.' defective design of AstroTurf and NexTurf amounts to willful, wanton, and/or reckless conduct by Defendants.

426.    As a direct and proximate result of Defendants' defective design and manufacture of AstroTurf and NexTurf products, Plaintiff David West developed brain cancer, Darren Daulton developed brain cancer, John Vukovich developed brain cancer, John Kruk developed testicular cancer, and Danny Jackson developed thyroid cancer, and each was injured catastrophically, including severe pain, suffering, disability, impairment, loss of enjoyment of life, loss of comfort, economic damages, and all the damages alleged throughout the entirety of this complaint.

427.    Therefore, as a result of the unreasonably dangerous condition of their AstroTurf products, AstroTurf Industries Inc. are strictly liable to Plaintiffs.

428.    The defects in Defendants' AstroTurf and NexTurf products were substantial and contributing factors in causing Plaintiffs' damages and/or increased the risk of harm of Plaintiffs' injuries, and, but for AstroTurf Industries Inc.' misconduct and omissions, Plaintiffs would not have sustained these damages.

429.    As a direct and proximate result of AstroTurf Industries Inc. placing their defective AstroTurf and NexTurf products into the stream of commerce, Plaintiffs suffered the damages set forth herein.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against AstroTurf Industries Inc., individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

Case ID: 240501584

## COUNT X: STRICT LIABILITY FOR FAILURE TO WARN
### _PLAINTIFFS v. ASTROTURF INDUSTRIES INC._

**430.** Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

**431.** Plaintiffs bring this strict liability claim against AstroTurf Industries Inc. for failure to warn.

**432.** At all relevant times, AstroTurf Industries Inc. were engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and/or promoting AstroTurf and NexTurf products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of AstroTurf and NexTurf and specifically, its PFAS and heavy metal contents, including PFOS, PFOA. These actions were under the ultimate control and supervision of AstroTurf Industries Inc..

**433.** AstroTurf Industries Inc. researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and/or otherwise released into the stream of commerce their AstroTurf and NexTurf products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs and persons responsible for consumers like him, and AstroTurf Industries Inc. therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of AstroTurf, NexTurf and PFAS-containing products and a duty to instruct on the proper, safe use of these products.

**434.** At all times relevant to this litigation, AstroTurf Industries Inc. had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure

76

that their AstroTurf and NexTurf products did not cause users and consumers to suffer from unreasonable and dangerous risks.

435.    AstroTurf Industries Inc. had a continuing duty to warn users, like Plaintiffs, of the dangers associated with AstroTurf and NexTurf use and exposure, and a continuing duty to instruct on the proper, safe use of these products.

436.    AstroTurf Industries Inc. had a continuing duty to warn installers, sellers, and distributors of AstroTurf that AstroTurf required a crumb rubber infill, which Defendants knew or should have known contained toxic levels of heavy metals.  Despite this knowledge, Defendants sold their product with toxic crumb rubber infill and/or required the product be installed with crumb rubber infill, and yet never warned installers, end users, the public, or Plaintiffs about the infill's toxic properties.

437.    AstroTurf Industries Inc., as manufacturers, sellers, and/or distributors of 'chemical grass' and/or artificial turf and/or PFAS-containing products, are held to the knowledge of experts in the field.

438.    At the time of manufacture and sale, AstroTurf Industries Inc. could have provided warnings or instructions regarding the full and complete risks of AstroTurf, NexTurf and PFAS-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to these products.

439.    At all times relevant to this litigation, AstroTurf Industries Inc. failed to investigate, study, test, or promote the safety of their AstroTurf and NexTurf products. Defendants also failed to minimize the dangers to users and consumers of their AstroTurf products and to those who would foreseeably use or be harmed by Defendants' products, including Plaintiffs.

Case ID: 240501584

440.    Despite the fact that AstroTurf Industries Inc. knew or should have known that their AstroTurf and NexTurf products posed a grave risk of harm, they failed to warn of the dangerous risks associated with their use and exposure.

441.    The dangerous propensities of their products and the carcinogenic characteristics of PFAS, heavy metals, and other chemical compounds in AstroTurf, as described above, were known to AstroTurf Industries Inc., or scientifically knowable to AstroTurf Industries Inc. through appropriate research and testing by known methods, at the time they distributed, supplied, and/or sold the product, and not known to end users and consumers, such as Plaintiffs.

442.    AstroTurf Industries Inc. knew or should have known that their AstroTurf, and NexTurf and PFAS-containing products created significant risks of serious bodily harm to consumers, as alleged herein, and AstroTurf Industries Inc. failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products.

443.    AstroTurf Industries Inc. have wrongfully concealed information concerning the dangerous nature of AstroTurf and NexTurf and its PFAS and heavy metals content, and further made false and/or misleading statements concerning the safety of AstroTurf, NexTurf and PFAS.

444.    At all times relevant to this litigation, AstroTurf Industries Inc.' AstroTurf and NexTurf products reached the intended consumers, handlers, and users or other persons coming into contact with these products throughout Pennsylvania and the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by AstroTurf Industries Inc..

445.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of AstroTurf Industries Inc.' AstroTurf and NexTurf products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

Case ID: 240501584

446. Plaintiffs could not have reasonably discovered the defects and risks associated with AstroTurf, NexTurf or PFAS-containing products before or at the time of their exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of AstroTurf Industries Inc..

447. AstroTurf Industries Inc. knew or should have known that the minimal warnings disseminated with their AstroTurf and NexTurf products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including at professional sports stadiums.

448. The information that AstroTurf Industries Inc. did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled athletes such as Plaintiffs to utilize the products safely and with adequate protection. Instead, AstroTurf Industries Inc. disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to AstroTurf, NexTurf, PFAS, heavy metals, and the other toxic chemicals in AstroTurf and NexTurf; continued to aggressively promote the efficacy of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and/or concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to AstroTurf and NexTurf and their chemical contents.

449. To this day, AstroTurf Industries Inc. have failed to adequately and accurately warn of the true risks associated with the use of and exposure to AstroTurf and NexTurf and its carcinogenic PFAS and heavy metals content.

79

Case ID: 240501584

450.    To this day, AstroTurf Industries Inc. have failed to test, investigate, or study their AstroTurf products.

451.    As a result of their inadequate warnings, AstroTurf Industries Inc.' AstroTurf and NexTurf products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed and sold by Defendants, and used by consumers like Plaintiffs.

452.    AstroTurf Industries Inc. are liable to Plaintiffs for injuries caused by their failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their AstroTurf and NexTurf products and the risks associated with the use of or exposure to AstroTurf, NexTurf PFAS, heavy metals, and the other toxic chemical contents of AstroTurf and NexTurf.

453.    The defects in AstroTurf Industries Inc.' AstroTurf and NexTurf products were substantial and contributing factors in causing Plaintiffs' damages, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained these damages.

454.    Had AstroTurf Industries Inc. provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their AstroTurf and NexTurf products, Plaintiffs could have avoided the risk of developing injuries as alleged herein.

455.    As a direct and proximate result of AstroTurf Industries Inc. placing their defective AstroTurf and NexTurf products into the stream of commerce and failing to warn Plaintiffs of the increased risk of cancer associated with the use of and/or exposure to AstroTurf and NexTurf products as described herein, Plaintiffs have developed cancer and was injured catastrophically, including having been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of comfort, and economic damages, including for medical care and

Case ID: 240501584

treatment. Plaintiffs will continue to incur damages associated with these Defendants' failures in the future.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against AstroTurf Industries Inc., individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

### COUNT XI: VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES ACT AND CONSUMER PROTECTION LAW, 73 P.S. SECTION 8201-1, ET SEQ. *PLAINTIFFS v. ASTROTURF INDUSTRIES INC.*

456.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

457.    At all relevant times, AstroTurf Industries Inc. knew or should have known of the unreasonably dangerous and carcinogenic nature of the use of and/or exposure to AstroTurf and NexTurf.

458.    At all relevant times, AstroTurf Industries Inc., through labeling, advertisements, public representations and marketing of AstroTurf and NexTurf, intentionally used deception, fraud, false pretenses, false promises, misrepresentations, misleading statements, and unfair trade practices in order to mislead consumers that AstroTurf and NexTurf products are safe for use.

459.    At all relevant times, AstroTurf Industries Inc. also engaged in the concealment, suppression and/or omission of material facts in connection with the sale and/or advertisement of AstroTurf and NexTurf products in trade or commerce. In particular, AstroTurf Industries Inc. failed to disclose to the public that AstroTurf and NexTurf are unsafe and pose serious health hazards, particularly various cancers, which Plaintiffs had.

460.    AstroTurf Industries Inc. were aware of the hazardous risks posed by AstroTurf and NexTurf and yet failed to inform the public of these risks through their advertisements, labeling,

81

or other means available to them. AstroTurf Industries Inc.' failure to state material facts about AstroTurf and NexTurf constitutes a violation of 73 P.S. §§ 201-1 et seq.

461.    At all relevant times, Plaintiffs were deceived by AstroTurf Industries Inc.' intentional misrepresentations and omissions, including by the orchestrated claims made on or in television commercials, advertising materials, websites, and on product labels and packaging regarding the usage and safety of AstroTurf and NexTurf.

462.    At all relevant times, Plaintiffs acted in reasonable reliance upon AstroTurf Industries Inc.' unlawful trade practices, and had the Defendants not engaged in the deceptive conduct described herein, Plaintiffs would not have used AstroTurf and NexTurf and/or would have protected themselves from exposure to AstroTurf and NexTurf.

463.    As a direct and proximate result of AstroTurf Industries Inc.' unlawful trade practices, Plaintiffs developed cancer and were injured catastrophically, having been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of comfort, and economic damages.

WHEREFORE, Plaintiffs demand damages, including punitive damages, against AstroTurf Industries Inc., individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

### COUNT XII: NEGLIGENCE
### *PLAINTIFFS v. ASTROTURF INDUSTRIES INC.*

464.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

Case ID: 240501584

465.     At all relevant times, AstroTurf Industries Inc. breached their duty to Plaintiffs and were otherwise negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing AstroTurf and NexTurf products.

466.     AstroTurf Industries Inc., directly or indirectly, caused AstroTurf and NexTurf products to be purchased and/or used by Plaintiffs.

467.     At all times relevant to this litigation, AstroTurf Industries Inc. had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of AstroTurf and NexTurf products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

468.     At all times relevant to this litigation, AstroTurf Industries Inc. had a duty to exercise reasonable care in the marketing, advertisement, and sale of AstroTurf and NexTurf products. AstroTurf Industries Inc.' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using AstroTurf and NexTurf and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to AstroTurf and NexTurf and, in particular, its PFAS, heavy metal, and other toxic chemical contents.

469.     At all times relevant to this litigation, AstroTurf Industries Inc. knew or, in the exercise of reasonable care, should have known of the hazards and dangers of AstroTurf and NexTurf and specifically, the carcinogenic properties of its chemical compounds.

470.     Accordingly, at all times relevant to this litigation, AstroTurf Industries Inc. knew or, in the exercise of reasonable care, should have known that use of or exposure to their AstroTurf

Case ID: 240501584

and NexTurf products could cause Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

471.    AstroTurf Industries Inc. knew or, in the exercise of reasonable care, should have known that AstroTurf and NexTurf are more toxic than PFAS alone and that safety studies on AstroTurf and NexTurf, their "inert" ingredients, and/or the additional chemical contents like heavy metals, were necessary to protect Plaintiffs from AstroTurf and NexTurf.

472.    AstroTurf Industries Inc. knew or, in the exercise of reasonable care, should have known that tests limited to AstroTurf and NexTurf's PFAS contents were insufficient to prove the safety of AstroTurf and NexTurf.

473.    AstroTurf Industries Inc. also knew or, in the exercise of reasonable care, should have known that users and consumers of AstroTurf and NexTurf were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to AstroTurf, NexTurf and PFAS-containing products.

474.    As such, AstroTurf Industries Inc. breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of AstroTurf and NexTurf products, in that AstroTurf Industries Inc. manufactured, produced, and sold defective products containing PFAS, heavy metals, and other chemical contents, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

Case ID: 240501584

475.    AstroTurf Industries Inc. failed to appropriately and adequately test AstroTurf, and NexTurf, and "inert" ingredients, and/or heavy metals, and other chemical contents to protect consumers like Plaintiffs from AstroTurf and NexTurf.

476.    Despite their ability and means to investigate, study, and test AstroTurf and NexTurf products and to provide adequate warnings, AstroTurf Industries Inc. have failed to do so. Indeed, AstroTurf Industries Inc. have wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to AstroTurf, NexTurf and PFAS.

477.    AstroTurf Industries Inc.' negligence included:

a) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing AstroTurf and NexTurf products without thorough and adequate pre- and post-market testing;
b) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing AstroTurf and NexTurf while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to PFAS, and, consequently, the risk of serious harm associated with human use of and exposure to AstroTurf and NexTurf;
c) Failing to undertake sufficient studies and conduct necessary tests to determine whether or not AstroTurf and NexTurf products and PFAS-containing products were safe for their intended use in professional sports stadiums;
d) Failing to test, investigate, or study AstroTurf and NexTurf products;
e) Failing to undertake sufficient studies and conduct necessary tests to determine the safety of "inert" ingredients and/or other chemical compounds contained within AstroTurf and NexTurf, including heavy metals, and others, and the propensity of these ingredients to render AstroTurf and NexTurf toxic, increase the toxicity of AstroTurf and NexTurf, whether these ingredients are carcinogenic, magnify the carcinogenic properties of AstroTurf and NexTurf, and whether or not these ingredients and compounds were safe for use;
f) Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of AstroTurf and NexTurf products so as to avoid the risk of serious harm associated with the prevalent use of AstroTurf at professional sports stadiums;
g) Failing to design and manufacture AstroTurf and NexTurf products so as to ensure they were at least as safe and effective as other artificial grass products on the market;

Case ID: 240501584

**h)** Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and/or be exposed to AstroTurf and NexTurf products;

**i)** Failing to disclose to Plaintiffs, users, consumers, and the general public that the use of and exposure to AstroTurf and NexTurf presented severe risks of cancer and other grave illnesses;

**j)** Failing to warn Plaintiffs, users, consumers, and the general public that the products' risk of harm was unreasonable and that there were safer and effective alternative artificial grass available to Plaintiffs, and other users or consumers;

**k)** Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effect of AstroTurf and NexTurf and PFAS-containing products;

**l)** Representing that AstroTurf and NexTurf products were safe for their intended use when, in fact, Defendants knew or should have known that the products were not safe for their intended use;

**m)** Declining to make or propose any changes to AstroTurf and NexTurf products' labeling or other promotional materials that would alert the consumers and the general public of the risks of AstroTurf, NexTurf and PFAS;

**n)** Advertising, marketing, and recommending the use of AstroTurf, NexTurf and PFAS-laden products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of or exposure to AstroTurf, NexTurf and PFAS;

**o)** Continuing to disseminate information to their consumers, which indicate or imply that AstroTurf and NexTurf products are not unsafe for their intended use;

**p)** Continuing the manufacture and sale of AstroTurf and NexTurf products with the knowledge that the products were unreasonably unsafe and dangerous;

**q)** Directing and/or encouraging and/or recommending that AstroTurf and NexTurf installers use crumb rubber infill with the AstroTurf and NexTurf;

**r)** Directing and/or encouraging and/or recommending that AstroTurf and NexTurf installers use crumb rubber infill with the AstroTurf and NexTurf, despite the fact that Defendants knew or should have known that such infill contained toxic levels of heavy metals;

**s)** Failing to warn end users, consumers, the general public, and installers of AstroTurf and NexTurf that AstroTurf and NexTurf's crumb rubber infill contained toxic levels of heavy metals which were carcinogenic;

**t)** Exposing end users, consumers, and the general public to heavy metals contained in AstroTurf and NexTurf's crumb rubber infill;

**u)** Requiring that AstroTurf and NexTurf be installed with crumb rubber infill;

**v)** Installing AstroTurf and NexTurf with crumb rubber infill; and

**w)** Selling, distributing, and otherwise placing AstroTurf and NexTurf into the stream of commerce with toxic crumb rubber infill.

**478.** AstroTurf Industries Inc. knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiffs, would suffer injuries as a result of AstroTurf

86

Case ID: 240501584

Industries Inc.' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of AstroTurf and NexTurf.

479.    Plaintiffs did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to AstroTurf and NexTurf or their PFAS and other chemical contents.

480.    AstroTurf Industries Inc.' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, and will continue to suffer, as described herein.

481.    AstroTurf Industries Inc. conduct, as described above, was reckless. AstroTurf Industries Inc. regularly risk the lives of consumers and users of AstroTurf and NexTurf products, including Plaintiffs, with full knowledge of the dangers of these products. AstroTurf Industries Inc. have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs, with respect to the dangers of AstroTurf and NexTurf about which AstroTurf Industries Inc. knew but the public, including Plaintiffs, did not. AstroTurf Industries Inc.' reckless conduct therefore warrants an award of punitive damages.

482.    As a proximate result of AstroTurf Industries Inc.' wrongful acts and omissions in placing defective AstroTurf and NexTurf products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of the product, Plaintiffs developed cancer and were injured catastrophically, having been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of comfort, and economic damages, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

Case ID: 240501584

**WHEREFORE**, Plaintiffs demands damages, including punitive damages, against AstroTurf Industries Inc., individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

## COUNT XIII: BREACH OF IMPLIED WARRANTIES
### *PLAINTIFFS v. ASTROTURF INDUSTRIES INC.*

**483.** Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

**484.** At all relevant times, AstroTurf Industries Inc. engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting their AstroTurf and NexTurf products, which are defective and unreasonably dangerous to users, consumers and those in proximity to users, including Plaintiffs, thereby placing AstroTurf and NexTurf products into the stream of commerce. These actions were under the ultimate control and supervision of AstroTurf Industries Inc.

**485.** Before the time that Plaintiffs were exposed to the use of the aforementioned AstroTurf and NexTurf products, AstroTurf Industries Inc. impliedly warranted to their consumers and users—including Plaintiffs — that their AstroTurf and NexTurf products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as artificial turf/grass for professional sports stadiums.

**486.** AstroTurf Industries Inc., however, failed to disclose that AstroTurf and NexTurf have dangerous propensities when used as intended and that the use of and/or exposure to AstroTurf, NexTurf and PFAS-containing products carry an increased risk of developing severe injuries and/or cancer, including Plaintiffs' damages.

88

Case ID: 240501584

**487.**    AstroTurf Industries Inc. further failed to test, investigate, or study their AstroTurf and NexTurf products.

**488.**    Upon information and belief, Plaintiffs reasonably relied upon the skill, superior knowledge and judgment of AstroTurf Industries Inc. and upon their implied warranties that the AstroTurf and NexTurf products were of merchantable quality and fit for their intended purpose or use.

**489.**    The AstroTurf and NexTurf products were expected to reach and did in fact reach consumers, users and those in proximity to users, including Plaintiffs, without substantial change in the condition in which they were manufactured and sold by AstroTurf Industries Inc.

**490.**    At all relevant times, AstroTurf Industries Inc. were aware that consumers, users, and those in proximity of users of their products, including Plaintiffs, would use AstroTurf and NexTurf products as marketed by Defendants, which is to say that Plaintiffs were the foreseeable users/end users of AstroTurf and NexTurf.

**491.**    AstroTurf Industries Inc. intended that their AstroTurf and NexTurf products be used in the manner in which Plaintiffs in fact used or was exposed to them and AstroTurf Industries Inc. impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that AstroTurf and NexTurf were not adequately tested or researched.

**492.**    In reliance upon AstroTurf Industries Inc.' implied warranty, Plaintiffs used or were in proximity to the use of AstroTurf and NexTurf as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by AstroTurf Industries Inc..

**493.**    Plaintiffs could not have reasonably discovered or known of the risks of serious injury associated with AstroTurf, NexTurf or PFAS.

Case ID: 240501584

494. AstroTurf Industries Inc. breached their implied warranties to Plaintiffs in that their AstroTurf and NexTurf products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. AstroTurf and NexTurf have dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

495. The harm caused by AstroTurf Industries Inc.' AstroTurf and NexTurf products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

496. As a direct and proximate result of AstroTurf Industries Inc.' wrongful acts and omissions, Plaintiffs suffered severe and permanent physical and emotional injuries and death.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against AstroTurf Industries Inc., individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

## COUNT XIV: FRAUDULENT CONCEALMENT
### *PLAINTIFFS v. ASTROTURF INDUSTRIES INC.*

497. Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

498. AstroTurf Industries Inc. are estopped from asserting a statute of limitations defense because it fraudulently concealed their wrongful conduct from Plaintiffs with the intent that Plaintiffs, as well as other consumers and users of AstroTurf and NexTurf, would justifiability rely on such material representations, on which Plaintiffs and others similarly situated did justifiability rely.

499. AstroTurf Industries Inc. had actual knowledge that exposure to AstroTurf and NexTurf and, specifically, their toxic chemical contents, including PFAS and heavy metals, could

Case ID: 240501584

result in cancer and other severe illnesses and injuries. AstroTurf Industries Inc. knew or should have known that AstroTurf and NexTurf are more toxic than PFAS alone and that safety studies of AstroTurf and NexTurf, AstroTurf and NexTurf's "inert" ingredients, and/or heavy metals were necessary to protect Plaintiffs from AstroTurf and NexTurf.

500.    AstroTurf Industries Inc. failed to conduct adequate testing of AstroTurf and NexTurf and their formulation.

501.    AstroTurf Industries Inc. had actual knowledge of their misrepresentations, negligence, breach of warranties, and false, misleading, deceptive, and unconscionable conduct. Even so, AstroTurf Industries Inc. perpetuated their wrongful conduct with the intent and fixed purpose of concealing their wrongs from Plaintiffs, and the public at large.

502.    Despite their knowledge that AstroTurf and NexTurf are considerably more dangerous than PFAS alone, AstroTurf Industries Inc. continued to promote AstroTurf and NexTurf as safe.

503.    Plaintiffs were unaware of the falsity of these representations, acted in actual and justifiable reliance on such material misrepresentations, and were injured as a direct and proximate result.

504.    Additionally, AstroTurf Industries Inc. knowingly omitted material information and remained silent regarding said misrepresentations despite the fact that they had a duty to inform Plaintiffs, and the general public, of the inaccuracy of said misrepresentations, which omission constitutes a positive misrepresentation of material fact, with the intent that Plaintiffs and the general public would rely on AstroTurf Industries Inc.' misrepresentations.

505.    Plaintiffs and the general public did, in fact, act in actual and justifiable reliance on AstroTurf Industries Inc.' representations, and Plaintiffs suffered damages as a result.

Case ID: 240501584

506. AstroTurf Industries Inc., as the manufacturers and sellers of AstroTurf and NexTurf, were in a position of superior knowledge and judgment regarding any potential risks associated with their products.

507. AstroTurf Industries Inc. committed constructive fraud by breaching one or more legal or equitable duties owed to Plaintiffs and the general public relating to AstroTurf and NexTurf, said breach or breaches constituting fraud because of their propensity to deceive others or constitute an injury to public interests or public policy.

508. In breaching their duties to Plaintiffs, AstroTurf Industries Inc. used their position of trust as the manufacturer and/or distributor of AstroTurf and NexTurf to increase sales of their products at the expense of informing Plaintiffs and the general public that use of or exposure to AstroTurf and NexTurf carries the risk of serious illness, such as cancer and other similar illnesses.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against AstroTurf Industries Inc., individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

## COUNT XV: STRICT LIABILITY
### *PLAINTIFFS v. DEFENDANT 3M*

509. Plaintiffs incorporate all preceding paragraphs in this Complaint here by reference.

510. For decades, 3M produced, manufactured, marketed, promoted, distributed, and/or sold PFAS chemicals, including PFOS and PFOA, through the United States, including in Pennsylvania and Philadelphia County.

511. 3M had a nondelegable duty to place into the stream of commerce only those products that were free of defects and dangers and, further, to refrain from placing into the stream

92

Case ID: 240501584

of commerce products that were in a defective condition, were unreasonably dangerous, that fail to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, and/or for which, on balance, the risks of their design outweigh the benefits of the same.

512.    3M expected PFAS to reach consumers, users, and other persons coming into contact with it, including Plaintiffs, players on the Philadelphia Phillies, without substantial change in its condition from when it was designed and manufactured.

513.    3M did, in fact, produce PFAS to the City of Philadelphia knowing that it would reach users and other persons coming into contact with it, including Plaintiffs, without substantial change in their condition from when those products and chemicals were designed and manufactured.

514.    At all relevant times, PFAS was in a defective condition, was unreasonably dangerous, failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, and/or on balance, the risks of its design outweighed the benefits of the same, once it reached consumers, users, and other persons who came into contact with it, including Plaintiffs.

515.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to PFAS in an intended or reasonably foreseeable manner without knowledge of its dangerous characteristics.

516.    Plaintiffs could not have reasonably discovered the defects and risks associated with PFAS before or at the time of exposure.

517.    The harm caused by Defendant 3M's manufacturing and production of PFAS far outweighed its benefit, rendering them dangerous to an extent beyond that which an ordinary

Case ID: 240501584

consumer would contemplate. PFAS was and is more dangerous than alternative products and Defendant could have avoided selling PFAS in such a dangerous form. Indeed, at the time that Defendant placed PFAS into the stream of commerce, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

518.    Placing PFAS into the stream of commerce amounts to willful, wanton, and/or reckless conduct by Defendant.

519.    As a direct and proximate result of the defective design and manufacture of PFAS, Plaintiff David West developed brain cancer, Plaintiff David West developed brain cancer, Darren Daulton developed brain cancer, John Vukovich developed brain cancer, John Kruk developed testicular cancer, and Danny Jackson developed thyroid cancer, and each was injured catastrophically, including severe pain, suffering, disability, impairment, loss of enjoyment of life, loss of comfort, economic damages, and all the damages alleged throughout the entirety of this complaint.

520.    Therefore, as a result of the unreasonably dangerous condition of PFAS, Defendant is strictly liable to Plaintiffs.

521.    The defects of PFAS were substantial and contributing factors in causing Plaintiffs' grave injuries and/or increased the risk of harm of Plaintiffs' injuries, and, but for Defendant's misconduct and omissions, Plaintiffs would not have sustained their injuries.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against the Defendant 3M, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

Case ID: 240501584

## COUNT XVI: STRICT LIABILITY FOR DEFECTIVE MANUFACTURE AND DESIGN
### *PLAINTIFFS v. DEFENDANT 3M*

**522.** Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

**523.** Plaintiffs bring this strict liability claim against Defendant 3M for defective manufacture and design.

**524.** At all relevant times, Defendant 3M was engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting of PFAS, which are defective and unreasonably dangerous to consumers, users, and other persons coming into contact with them, including Plaintiffs, thereby placing PFAS into the stream of commerce. These actions were under the ultimate control and supervision of Defendant 3M.

**525.** At all times relevant to this litigation, Defendant 3M designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed PFAS.

**526.** At all times relevant to this litigation, chemical components of the PFAS manufactured and produced by Defendant 3M was used in the AstroTurf, acting by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers, distributors, subsidiaries, sister corporations, parent companies, successor corporations and/or predecessor corporations, that then was used by Plaintiffs and/or which Plaintiffs were exposed.

**527.** At all times relevant to this litigation, PFAS was manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Plaintiffs.

Case ID: 240501584

528.    At all times relevant to this litigation, PFAS reached the intended consumers, handlers, and users or other persons coming into contact with these chemicals in Pennsylvania and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendant 3M.

529.    PFAS as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant 3M, was defectively manufactured and designed by Defendant in that when it left the hands of the Defendant's manufacturers and/or suppliers it was unreasonably dangerous because not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

530.    PFAS as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendant, weas defective in manufacture, design, and formulation in that when they left the hands of Defendant's manufacturers and/or suppliers, the foreseeable risks associated with its reasonably foreseeable uses exceeded the alleged benefits associated with its design and formulation.

531.    At all relevant times, PFAS created significant risks to the health and safety of consumers and others who were exposed to the products that far outweigh the risks posed by other products on the market used for the same or similar purpose.

532.    Therefore, at all relevant times to this litigation, PFAS, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendant, were defective in design and formulation, in one or more of the following ways:

    **a)**  When placed in the stream of commerce, PFAS was defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect;

Case ID: 240501584

**b)** When placed in the stream of commerce, PFAS was unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

**c)** When placed in the stream of commerce, PFAS contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

**d)** Defendant 3M did not sufficiently test, investigate, or study PFAS and, specifically, levels of PFOS and PFOA;

**e)** Defendant 3M failed to test, investigate, or study formulated PFAS;

**f)** Exposure to PFAS presents a risk of harmful side effects that outweighs any potential utility stemming from the use it;

**g)** Defendant 3M knew or should have known at the time of marketing PFAS that exposure to it and specifically, PFOS and PFOA, could result in cancer and other severe illnesses and injuries;

**h)** Defendant 3M did not conduct adequate post-marketing surveillance of PFAS; and

**i)** Defendants could have employed safer alternative designs and formulations.

533. At all times relevant to this litigation, Plaintiffs used and/or were exposed to the PFAS in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

534. Plaintiffs could not have reasonably discovered the defects and risks associated with PFAS before or at the time of exposure.

535. The harm caused by PFAS far outweighed its benefit, rendering PFAS dangerous to an extent beyond that which an ordinary consumer would contemplate. PFAS was and is more dangerous than alternative chemicals and products and Defendant could have designed to make less dangerous. Indeed, at the time that Defendant designed PFAS, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

536. Defendant 3M's defective design of PFAS amounts to willful, wanton, and/or reckless conduct by Defendant.

537. As a direct and proximate result of the defective design and manufacture of PFAS, Plaintiff David West developed brain cancer, Darren Daulton developed brain cancer,

Case ID: 240501584

John Vukovich developed brain cancer, John Kruk developed testicular cancer, and Danny Jackson developed thyroid cancer, and each was injured catastrophically, including severe pain, suffering, disability, impairment, loss of enjoyment of life, loss of comfort, economic damages, and all the damages alleged throughout the entirety of this complaint.

**538.** Therefore, as a result of the unreasonably dangerous condition of PFAS, Defendant 3M is strictly liable to Plaintiffs.

**539.** The defects in PFAS were substantial and contributing factors in causing Plaintiffs' damages and/or increased the risk of harm of Plaintiffs' injuries, and, but for Defendant 3M's misconduct and omissions, Plaintiffs would not have sustained these damages.

**540.** As a direct and proximate result of Defendant 3M placing PFAS into the stream of commerce, Plaintiffs suffered the damages set forth herein.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against Defendant 3M, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

## COUNT XVII: STRICT LIABILITY FOR FAILURE TO WARN
### *PLAINTIFFS v. DEFENDANT 3M*

**541.** Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

**542.** Plaintiffs bring this strict liability claim against Defendant 3M for failure to warn.

**543.** At all relevant times, Defendant 3M was engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and/or promoting PFAS, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of

Case ID: 240501584

promoting PFAS, including PFOS and PFOA. These actions were under the ultimate control and supervision of Defendant 3M.

544.    Defendant 3M researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and/or otherwise released into the stream of commerce PFAS and in the course of same, directly advertised or marketed the products and chemicals to consumers and end users, including Plaintiffs and persons responsible for consumers like them, and Defendant 3M therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of PFAS and a duty to instruct on the proper, safe use of it.

545.    At all times relevant to this litigation, Defendant 3M had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that PFAS did not cause users and consumers to suffer from unreasonable and dangerous risks.

546.    Defendant 3M had a continuing duty to warn users, like Plaintiffs, of the dangers associated with PFAS' use and exposure, and a continuing duty to instruct on the proper, safe use of it and products containing PFAS.

547.    Defendant 3M had a continuing duty to warn installers, sellers, and distributors of PFAS' toxicity and danger, which Defendants knew or should have known of.  Despite this knowledge, Defendants sold PFAS to third parties to use in their own products, and yet never warned about its dangerous chemical makeup.

548.    Defendant 3M, as manufacturers, sellers, and/or distributors of PFAS, are held to the knowledge of experts in the field.

Case ID: 240501584

549.    At the time of manufacture and sale, Defendant 3M could have provided warnings or instructions regarding the full and complete risks of PFAS because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to it.

550.    At all times relevant to this litigation, Defendant 3M failed to investigate, study, test, or promote the safety of PFAS. Defendants also failed to minimize the dangers to users and consumers of PFAS to those who would foreseeably use or be harmed by PFAS, including Plaintiffs.

551.    Despite the fact that Defendant 3M knew or should have known that PFAS posed a grave risk of harm, they failed to warn of the dangerous risks associated with its use and exposure.

552.    The dangerous propensities of PFAS, as described above, were known to Defendant 3M, or scientifically knowable to them through appropriate research and testing by known methods, at the time they distributed, supplied, and/or sold PFAS, and not known to end users and consumers, such as Plaintiffs.

553.    Defendant 3M knew or should have known that PFAS created significant risks of serious bodily harm to consumers, as alleged herein, which they failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products and chemicals.

554.    Defendant 3M wrongfully concealed information concerning the dangerous nature of PFAS and further made false and/or misleading statements concerning the safety of PFAS.

555.    At all times relevant to this litigation, PFAS reached the intended consumers, handlers, and users or other persons coming into contact with these products and chemicals

100

throughout Pennsylvania and the United States, including Plaintiffs, without substantial change in its condition as designed, manufactured, sold, distributed, labeled, and marketed by them.

556.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of PFAS in its intended or reasonably foreseeable manner without knowledge of its dangerous characteristics.

557.    Plaintiffs could not have reasonably discovered the defects and risks associated with PFAS before or at the time of their exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Defendant 3M.

558.    Defendant 3M knew or should have known that the minimal warnings disseminated with PFAS were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render PFAS safe for its ordinary, intended, and reasonably foreseeable uses, including in third-party products.

559.    The information that Defendant 3M did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled third-parties to utilize PFAS safely. Instead, Defendant 3M disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to PFAS, including PFOS and PFOA; continued to aggressively promote the efficacy of PFAS, even after they knew or should have known of the unreasonable risks from use or exposure; and/or concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to PFAS.

101

Case ID: 240501584

560.    To this day, Defendant 3M have failed to adequately and accurately warn of the true risks associated with the use of and exposure to PFAS.

561.    To this day, Defendant 3M have failed to test, investigate, or study PFAS.

562.    As a result of their inadequate warnings, PFAS was defective and unreasonably dangerous when it left the possession and/or control of Defendant, was distributed and sold by Defendant, and used by consumers like Plaintiffs.

563.    Defendant 3M is liable to Plaintiffs for injuries caused by its failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of PFAS and the risks associated with the use of or exposure to PFAS, including PFOS and PFOA.

564.    The defects in PFAS are substantial and contributing factors in causing Plaintiffs' damages, and, but for Defendant's misconduct and omissions, Plaintiff would not have sustained these damages.

565.    Had Defendant 3M provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with PFAS, Plaintiffs could have avoided the risk of developing injuries as alleged herein.

566.    As a direct and proximate result of Defendant 3M placing PFAS and its dangerous and toxic chemical components into the stream of commerce and failing to warn Plaintiffs of the increased risk of cancer associated with the use of and/or exposure to PFAS as described herein, Plaintiffs have developed cancer and was injured catastrophically, including having been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of comfort, and economic damages, including for medical care and treatment. Plaintiffs will continue to incur damages associated with these Defendant's failures in the future.

Case ID: 240501584

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against Defendant 3M, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

### COUNT XVIII: VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES ACT AND CONSUMER PROTECTION LAW, 73 P.S. SECTION 8201-1, ET SEQ.
### *PLAINTIFFS v. DEFENDANT 3M*

567.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

568.    At all relevant times, Defendant 3M knew or should have known of the unreasonably dangerous and carcinogenic nature of the use of and/or exposure to PFAS.

569.    At all relevant times, Defendant 3M, through labeling, advertisements, public representations and marketing of PFAS, intentionally used deception, fraud, false pretenses, false promises, misrepresentations, misleading statements, and unfair trade practices in order to mislead consumers that PFAS is safe for use.

570.    At all relevant times, Defendant 3M also engaged in the concealment, suppression and/or omission of material facts in connection with the sale and/or advertisement of PFAS in trade or commerce. In particular, Defendant 3M failed to disclose to the public that PFAS is unsafe and poses serious health hazards, particularly various cancers, which Plaintiffs had.

571.    Defendant 3M was aware of the hazardous risks posed by PFAS and yet failed to inform the public of these risks through their advertisements, labeling, or other means available to them. Defendant 3M's failure to state material facts about PFAS constitutes a violation of 73 P.S. §§ 201-1 et seq.

Case ID: 240501584

572.    At all relevant times, Plaintiffs were deceived by Defendant 3M's intentional misrepresentations and omissions, including by the orchestrated claims made on or in television commercials, advertising materials, websites, and on product labels and packaging regarding the usage and safety of PFAS.

573.    At all relevant times, Plaintiffs acted in reasonable reliance upon Defendant 3M's unlawful trade practices, and had Defendant not engaged in the deceptive conduct described herein, Plaintiffs would not have played on AstroTurf that contained PFAS and/or would have protected themselves from exposure to the PFAS contained in the AstroTurf.

574.    As a direct and proximate result of Defendant 3M's unlawful trade practices, Plaintiffs developed cancer and were injured catastrophically, having been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of comfort, and economic damages.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against Defendant 3M, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

## COUNT XIX: NEGLIGENCE
### _PLAINTIFFS v. DEFENDANT 3M_

575.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

576.    At all relevant times, Defendant 3M breached their duty to Plaintiffs and were otherwise negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing PFAS.

Case ID: 240501584

577.    Defendant 3M, directly or indirectly, caused PFAS to be purchased and/or used by Plaintiffs.

578.    At all times relevant to this litigation, Defendant 3M had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of PFAS, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

579.    At all times relevant to this litigation, Defendant 3M had a duty to exercise reasonable care in the marketing, advertisement, and sale of PFAS. Defendant 3M's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using PFAS and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to PFAS chemicals, and, in particular, PFOS and PFOA, and other toxic chemical contents.

580.    At all times relevant to this litigation, Defendant 3M knew or, in the exercise of reasonable care, should have known of the hazards and dangers of PFAS.

581.    Accordingly, at all times relevant to this litigation, Defendant 3M knew or, in the exercise of reasonable care, should have known that use of or exposure to PFAS could cause Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these chemicals, including Plaintiffs.

582.    Defendant 3M knew or, in the exercise of reasonable care, should have known that PFAS was toxic to humans and safety studies were necessary to protect Plaintiffs from exposure to PFAS.

Case ID: 240501584

583.    Defendant 3M knew or, in the exercise of reasonable care, should have known that any tests conducted limited to PFAS' content were insufficient to prove the safety of PFAS.

584.    Defendant 3M also knew or, in the exercise of reasonable care, should have known that users and consumers of PFAS were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to PFAS chemicals.

585.    As such, Defendant 3M breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of PFAS, in that Defendant 3M manufactured, produced, and sold defective chemicals containing PFAS, including PFOS and PFOA, and other chemical contents, knew or had reason to know of the defects inherent in these chemicals, knew or had reason to know that a user's or consumer's exposure to the chemicals created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

586.    Defendant 3M failed to appropriately and adequately develop, manufacture and test PFAS to protect consumers like Plaintiffs.

587.    Despite their ability and means to investigate, study, and test PFAS and to provide adequate warnings, Defendant 3M have failed to do so. Indeed, Defendant 3M have wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to PFAS.

588.    Defendant 3M's negligence included:

   a) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing PFAS without thorough and adequate pre- and post-market testing;
   b) Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing PFAS while negligently and/or intentionally

Case ID: 240501584

concealing and failing to disclose the results of trials, tests, and studies of exposure to PFOS and PFOA, and, consequently, the risk of serious harm associated with human use of and exposure to PFOS and PFOA;

**c)** Failing to undertake sufficient studies and conduct necessary tests to determine whether or not PFAS chemicals were safe for their intended;

**d)** Failing to test, investigate, or study PFAS;

**e)** Failing to undertake sufficient studies and conduct necessary tests to determine the safety of PFOS and PFOA, the toxicity of these chemicals, increase the toxicity of other products, and whether or not these ingredients and compounds were safe for use;

**f)** Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of PFAS so as to avoid the risk of serious harm associated with the prevalent use of PFAS;

**g)** Failing to design and manufacture PFAS so as to ensure it was at least as safe and effective as other chemicals on the market;

**h)** Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendant could reasonably foresee would use and/or be exposed to PFAS;

**i)** Failing to disclose to Plaintiffs, users, consumers, and the general public that the use of and exposure to PFAS presented severe risks of cancer and other grave illnesses;

**j)** Failing to warn Plaintiffs, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative products available to Plaintiffs, and other users or consumers;

**k)** Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effect of PFAS;

**l)** Representing that PFAS was safe for its intended use when, in fact, Defendants knew or should have known that the chemicals were not safe for their intended use;

**m)** Declining to make or propose any changes to PFAS labeling or other promotional materials that would alert the consumers and the general public of the risks of PFAS;

**n)** Advertising, marketing, and recommending the use of PFAS, while concealing and failing to disclose or warn of the dangers known by Defendant to be associated with or caused by the use of or exposure to PFAS;

**o)** Continuing to disseminate information to its consumers, which indicate or imply that PFAS is not unsafe for its intended use;

**p)** Continuing the manufacture and sale of PFAS with the knowledge that it was unreasonably unsafe and dangerous;

**q)** Failing to warn end users, consumers, and the general public, of the toxicity and danger of PFAS; and

**r)** Exposing end users, consumers, and the general public to the toxic chemicals contained in PFAS.

Case ID: 240501584

589.    Defendant 3M knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiffs, would suffer injuries as a result of Defendant 3M's failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of PFAS.

590.    Plaintiffs did not know the nature and extent of the serious harm that could result from the intended use of and/or exposure to PFAS, including PFOS and PFOA.

591.    Defendant 3M's negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, and will continue to suffer, as described herein.

592.    Defendant 3M's conduct, as described above, was reckless. Defendant 3M regularly risks the lives of consumers and users of PFAS, including Plaintiffs, with full knowledge of the dangers of these chemicals. Defendant 3M have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs, with respect to the dangers of PFAS about which Defendant 3M knew but the public, including Plaintiffs, did not. Defendant 3M's reckless conduct therefore warrants an award of punitive damages.

593.    As a proximate result of Defendant 3M's wrongful acts and omissions in placing PFAS into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of it, Plaintiffs developed cancer and were injured catastrophically, having been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of comfort, and economic damages, including significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

**WHEREFORE**, Plaintiffs demands damages, including punitive damages, against Defendant 3M, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

Case ID: 240501584

## COUNT XX: BREACH OF IMPLIED WARRANTIES
### *PLAINTIFFS v. DEFENDANT 3M*

**594.**    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

**595.**    At all relevant times, Defendant 3M were engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting PFAS, which is defective and unreasonably dangerous to users, consumers and those in proximity to users, including Plaintiffs, thereby placing PFAS into the stream of commerce. These actions were under the ultimate control and supervision of Defendant 3M.

**596.**    Before the time that Plaintiffs were exposed to the use of the aforementioned PFAS, Defendant 3M impliedly warranted to its consumers and users—including Plaintiffs — that PFAS was of merchantable quality and safe and fit for the use for which it was intended.

**597.**    Defendant 3M, however, failed to disclose that PFAS has dangerous propensities when used as intended and that the use of and/or exposure to PFAS, including PFOS, and PFOA, as it carries an increased risk of developing severe injuries and/or cancer, including Plaintiffs' damages.

**598.**    Defendant 3M further failed to test, investigate, or study PFAS.

**599.**    Upon information and belief, Plaintiffs reasonably relied upon the skill, superior knowledge and judgment of Defendant 3M and upon their implied warranties that PFAS was of merchantable quality and fit for its intended purpose or use.

**600.**    PFAS was expected to reach and did in fact reach consumers, users and those in proximity to users, including Plaintiffs, without substantial change in the condition in which it was manufactured and sold by Defendant 3M.

Case ID: 240501584

601.    At all relevant times, Defendant 3M was aware that consumers, users, and those in proximity of users of PFAS, including Plaintiffs, would use PFAS as marketed by Defendants, which is to say that Plaintiffs were the foreseeable users/end users of PFAS.

602.    Defendant 3M intended that PFAS be used in the manner in which Plaintiffs in fact used or was exposed to them and Defendant 3M impliedly warranted it to be of merchantable quality, safe, and fit for this use, despite the fact that PFAS was not adequately tested or researched.

603.    In reliance upon Defendant 3M's implied warranties, Plaintiffs used or were in proximity to the use of PFAS chemicals as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendant 3M.

604.    Plaintiffs could not have reasonably discovered or known of the risks of serious injury associated with PFAS.

605.    Defendant 3M breached their implied warranties to Plaintiffs in that PFAS was not of merchantable quality, safe, or fit for its intended use, or adequately tested. PFAS has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

606.    The harm caused by Defendant 3M's PFAS far outweighed its benefit, rendering it more dangerous than an ordinary consumer or user would expect and more dangerous than alternative chemicals.

607.    As a direct and proximate result of the Defendant 3M's wrongful acts and omissions, Plaintiffs suffered severe and permanent physical and emotional injuries and death.

Case ID: 240501584

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against Defendant 3M, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

## COUNT XXI: FRAUDULENT CONCEALMENT
### *PLAINTIFFS v. DEFENDANT 3M*

**608.** Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

**609.** Defendant 3M are estopped from asserting a statute of limitations defense because it fraudulently concealed its wrongful conduct from Plaintiffs with the intent that Plaintiffs, as well as other consumers and users of PFAS, would justifiability rely on such material representations, on which Plaintiffs and others similarly situated did justifiability rely.

**610.** Defendant 3M had actual knowledge that exposure to PFAS and, specifically, its toxic chemical contents, including PFOS and PFOA, could result in cancer and other severe illnesses and injuries. Defendant 3M knew or should have known that PFAS is toxic and that safety studies of PFAS were necessary to protect Plaintiffs from PFAS-containing products.

**611.** Defendant 3M failed to conduct adequate testing of PFAS.

**612.** Defendant 3M had actual knowledge of its misrepresentations, negligence, breach of warranties, and false, misleading, deceptive, and unconscionable conduct. Even so, Defendant 3M perpetuated their wrongful conduct with the intent and fixed purpose of concealing its wrongs from Plaintiffs, and the public at large.

**613.** Despite its knowledge that PFAS is toxic, Defendant 3M continued to promote PFAS as safe.

Case ID: 240501584

614.    Plaintiffs were unaware of the falsity of these representations, acted in actual and justifiable reliance on such material misrepresentations, and were injured as a direct and proximate result.

615.    Additionally, Defendant 3M knowingly omitted material information and remained silent regarding said misrepresentations despite the fact that they had a duty to inform Plaintiffs, and the general public, of the inaccuracy of said misrepresentations, which omission constitutes a positive misrepresentation of material fact, with the intent that Plaintiffs and the general public would rely on the Defendant 3M's misrepresentations.

616.    Plaintiffs and the general public did, in fact, act in actual and justifiable reliance on Defendant 3M's representations, and Plaintiffs suffered damages as a result.

617.    Defendant 3M, as the manufacturers and sellers of PFAS, were in a position of superior knowledge and judgment regarding any potential risks associated with it.

618.    Defendant 3M committed constructive fraud by breaching one or more legal or equitable duties owed to Plaintiffs and the general public relating to PFAS, said breach or breaches constituting fraud because of their propensity to deceive others or constitute an injury to public interests or public policy.

619.    In breaching its duties to Plaintiffs, Defendant 3M used their position of trust as the manufacturer and/or distributor of PFAS to increase sales at the expense of informing Plaintiffs and the general public that use of or exposure to PFAS carries the risk of serious illness, such as cancer and other similar illnesses.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against Defendant 3M, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

112

Case ID: 240501584

## COUNT XXII: STRICT LIABILITY
### *PLAINTIFFS v. THE DUPONT DEFENDANTS*

**620.** Plaintiffs incorporate all preceding paragraphs in this Complaint here by reference.

**621.** The Dupont Defendants produced, manufactured, marketed, promoted, distributed, and/or sold PFAS and PFAS-containing products through the United States, including in Pennsylvania and Philadelphia County.

**622.** The Dupont Defendants had a nondelegable duty to place into the stream of commerce only those products that were free of defects and dangers and, further, to refrain from placing into the stream of commerce products that were in a defective condition, were unreasonably dangerous, that fail to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner, and/or for which, on balance, the risks of their design outweigh the benefits of the same.

**623.** The Dupont Defendants expected PFAS and PFAS-containing products to reach consumers, users, and other persons coming into contact with it, including Plaintiffs, players on the Philadelphia Phillies, without substantial change in their condition from when they were designed and manufactured.

**624.** The DuPont Defendants did, in fact, produce PFAS and PFAS-containing products to the City of Philadelphia knowing that they would reach users and other persons coming into contact with them, including Plaintiffs, without substantial change in their condition from when the chemicals and products were designed and manufactured.

**625.** At all relevant times, PFAS and PFAS-containing products were in a defective condition, were unreasonably dangerous, failed to perform as safely as an ordinary consumer

Case ID: 240501584

would expect when used in an intended or reasonably foreseeable manner, and/or on balance, the risks of their design outweighed the benefits of the same, once they reached consumers, users, and other persons who came into contact with them, including Plaintiffs.

626. At all times relevant to this litigation, Plaintiffs used and/or were exposed to PFAS and PFAS-containing products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

627. Plaintiffs could not have reasonably discovered the defects and risks associated with PFAS and PFAS-containing products before or at the time of exposure.

628. The harm caused by the Dupont Defendants' manufacturing and production of PFAS and PFAS-containing products far outweighed their benefit, rendering them dangerous to an extent beyond that which an ordinary consumer would contemplate. PFAS and PFAS-containing products were and are more dangerous than alternative products and Defendants could have avoided selling PFAs and PFAs-containing products in such a dangerous form. Indeed, at the time that Defendants placed PFAS and PFAS-containing products into the stream of commerce, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

629. Placing PFAS and PFAS-containing products into the stream of commerce amounts to willful, wanton, and/or reckless conduct by Defendants.

630. As a direct and proximate result of the defective design and manufacture of PFAS and PFAS-containing products, Plaintiff David West developed brain cancer, Darren Daulton developed brain cancer, John Vukovich developed brain cancer, John Kruk developed testicular cancer, and Danny Jackson developed thyroid cancer, and each was injured catastrophically,

Case ID: 240501584

including severe pain, suffering, disability, impairment, loss of enjoyment of life, loss of comfort, economic damages, and all the damages alleged throughout the entirety of this complaint.

631.    Therefore, as a result of the unreasonably dangerous condition of PFAS and PFAS-containing products, Defendants are strictly liable to Plaintiffs.

632.    The defects in PFAS and PFAS-containing products were substantial and contributing factors in causing Plaintiffs' grave injuries and/or increased the risk of harm of Plaintiffs' injuries, and, but for Defendants' misconduct and omissions, Plaintiffs would not have sustained their injuries.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against the DuPont Defendants individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

### COUNT XXIII: STRICT LIABILITY FOR DEFECTIVE MANUFACTURE AND DESIGN
### *PLAINTIFFS v. THE DUPONT DEFENDANTS*

633.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

634.    Plaintiffs bring this strict liability claim against the DuPont Defendants for defective manufacture and design.

635.    At all relevant times, the DuPont Defendants were engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting of PFAS and PFAS-containing products, which are defective and unreasonably dangerous to consumers, users, and other persons coming into contact with them, including Plaintiffs, thereby

Case ID: 240501584

placing PFAS and PFAS-containing products into the stream of commerce. These actions were under the ultimate control and supervision of the DuPont Defendants.

636.    At all times relevant to this litigation, the DuPont Defendants designed, researched, developed, formulated, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed PFAS and PFAS-containing products.

637.    At all times relevant to this litigation, chemical components of the PFAS and PFAS-containing products manufactured and produced by the DuPont Defendants was used in the AstroTurf product, acting by and through its agents, servants, workers, contractors, designers, assemblers, manufacturers, sellers, suppliers, distributors, subsidiaries, sister corporations, parent companies, successor corporations and/or predecessor corporations, that then was used by Plaintiffs and/or which Plaintiffs were exposed.

638.    At all times relevant to this litigation, the DuPont Defendants' PFAS and PFAS-containing products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and, in particular, Plaintiffs.

639.    At all times relevant to this litigation, the DuPont Defendants' PFAS and PFAS-containing products reached the intended consumers, handlers, and users or other persons coming into contact with these products in Pennsylvania and throughout the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by the DuPont Defendants.

640.    The DuPont Defendants' PFAS and PFAS-containing products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants, were defectively manufactured and designed by Defendants in

116

Case ID: 240501584

that when they left the hands of the Defendants' manufacturers and/or suppliers, they were unreasonably dangerous because they were not as safe as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

641.    The DuPont Defendants' PFAS and PFAS-containing products, as researched, tested, developed, designed, licensed, formulated, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants, were defective in manufacture, design, and formulation in that when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks associated with these products' reasonably foreseeable uses exceeded the alleged benefits associated with their design and formulation.

642.    At all relevant times, the DuPont Defendants' PFAS and PFAS-containing products created significant risks to the health and safety of consumers and others who were exposed to the products that far outweigh the risks posed by other products on the market used for the same or similar purpose.

643.    Therefore, at all relevant times to this litigation, the DuPont Defendants' PFAS and PFAS-containing products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants, were defective in design and formulation, in one or more of the following ways:

   a)  When placed in the stream of commerce, PFAS and PFAS-containing products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would expect;
   b)  When placed in the stream of commerce, PFAS and PFAS-containing products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;
   c)  When placed in the stream of commerce, PFAS and PFAS-containing products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;
   d)  The DuPont Defendants did not sufficiently test, investigate, or study PFAS and PFAS-containing products and, specifically, their levels of PFOS and PFOA;

117

**e)** The DuPont Defendants failed to test, investigate, or study their formulated PFAS and PFAS-containing products;

**f)** Exposure to PFAS and PFAS-containing products presents a risk of harmful side effects that outweighs any potential utility stemming from the use of the product;

**g)** The DuPont Defendants knew or should have known at the time of marketing their PFAS and PFAS-containing products that exposure to them, PFOS and PFOA, could result in cancer and other severe illnesses and injuries;

**h)** The DuPont Defendants did not conduct adequate post-marketing surveillance of their PFAS and PFAS-containing products; and

**i)** Defendants could have employed safer alternative designs and formulations.

644.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the DuPont Defendants' PFAS and PFAS-containing products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

645.    Plaintiffs could not have reasonably discovered the defects and risks associated with PFAS and PFAS-containing products before or at the time of exposure.

646.    The harm caused by the DuPont Defendants' PFAS and PFAS-containing products far outweighed their benefit, rendering the DuPont Defendants' PFAS and PFAS-containing products dangerous to an extent beyond that which an ordinary consumer would contemplate. DuPont Defendants' PFAS and PFAS-containing products were and are more dangerous than alternative products and Defendants could have designed them to make them less dangerous. Indeed, at the time that Defendants designed PFAS and PFAS-containing products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

647.    The DuPont Defendants' defective design of PFAS and PFAS-containing products amounts to willful, wanton, and/or reckless conduct by Defendants.

648.    As a direct and proximate result of the defective design and manufacture of PFAS and PFAS-containing products, Plaintiff David West developed brain cancer, Darren Daulton developed brain cancer, John Vukovich developed brain cancer, John Kruk developed testicular

118

Case ID: 240501584

cancer, and Danny Jackson developed thyroid cancer, and each was injured catastrophically, including severe pain, suffering, disability, impairment, loss of enjoyment of life, loss of comfort, economic damages, and all the damages alleged throughout the entirety of this complaint.

649.    Therefore, as a result of the unreasonably dangerous condition of PFAS and PFAS-containing products, the DuPont Defendants are strictly liable to Plaintiffs.

650.    The defects in the DuPont Defendants' PFAS and PFAS-containing products were substantial and contributing factors in causing Plaintiffs' damages and/or increased the risk of harm of Plaintiffs' injuries, and, but for the DuPont Defendants' misconduct and omissions, Plaintiffs would not have sustained these damages.

651.    As a direct and proximate result of the DuPont Defendants placing their defective PFAS and PFAS-containing products into the stream of commerce, Plaintiffs suffered the damages set forth herein.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against the DuPont Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

### COUNT XXIV: STRICT LIABILITY FOR FAILURE TO WARN
### *PLAINTIFFS v. THE DUPONT DEFENDANTS*

652.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

653.    Plaintiffs bring this strict liability claim against the DuPont Defendants for failure to warn.

654.    At all relevant times, the DuPont Defendants were engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and/or promoting

Case ID: 240501584

PFAS and PFAS-containing products, which are defective and unreasonably dangerous to consumers, including Plaintiffs, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of promoting PFAS and PFAS-containing products, including PFOS and PFOA. These actions were under the ultimate control and supervision of the DuPont Defendants.

655.    The DuPont Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and/or otherwise released into the stream of commerce their PFAS and PFAS-products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Plaintiffs and persons responsible for consumers like them, and the DuPont Defendants therefore had a duty to warn of the risks associated with the reasonably foreseeable uses (and misuses) of PFAS and PFAS-containing products and a duty to instruct on the proper, safe use of these products and chemicals.

656.    At all times relevant to this litigation, the DuPont Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that its PFAS and PFAS-containing products did not cause users and consumers to suffer from unreasonable and dangerous risks.

657.    The DuPont Defendants had a continuing duty to warn users, like Plaintiffs, of the dangers associated with PFAS' use and exposure, and a continuing duty to instruct on the proper, safe use of it and PFAS-containing products.

658.    The DuPont Defendants had a continuing duty to warn installers, sellers, and distributors of PFAS' and PFAS-containing products' toxicity and danger, which Defendants knew

Case ID: 240501584

or should have known of.  Despite this knowledge, Defendants used PFAS in their own products and sold PFAS to third parties for use, and yet never warned about its dangerous chemical makeup.

659.    The DuPont Defendants, as manufacturers, sellers, and/or distributors of PFAS and PFAS-containing products, are held to the knowledge of experts in the field.

660.    At the time of manufacture and sale, the DuPont Defendants could have provided warnings or instructions regarding the full and complete risks of PFAS and PFAS-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure PFAS and PFAS-containing products.

661.    At all times relevant to this litigation, the DuPont Defendants failed to investigate, study, test, or promote the safety of PFAS and PFAS-containing products. Defendants also failed to minimize the dangers to users and consumers of PFAS and PFAS-containing products and to those who would foreseeably use or be harmed by them, including Plaintiffs.

662.    Despite the fact that the DuPont Defendants knew or should have known that PFAS and PFAS-containing products posed a grave risk of harm, they failed to warn of the dangerous risks associated with their use and exposure.

663.    The dangerous propensities of their products and the carcinogenic characteristics of PFAS, as described above, were known to the DuPont Defendants, or scientifically knowable to them through appropriate research and testing by known methods, at the time they distributed, supplied, and/or sold the products and chemicals, and not known to end users and consumers, such as Plaintiffs.

664.    The DuPont Defendants knew or should have known that PFAS and PFAS-containing products created significant risks of serious bodily harm to consumers, as alleged

121

Case ID: 240501584

herein, which they failed to adequately warn consumers and reasonably foreseeable users of the risks of exposure to these products and chemicals.

665.    The DuPont Defendants wrongfully concealed information concerning the dangerous nature of PFAS and PFAS-containing products, and further made false and/or misleading statements concerning the safety of them.

666.    At all times relevant to this litigation, PFAS and PFAS-containing products reached the intended consumers, handlers, and users or other persons coming into contact with these products and chemicals throughout Pennsylvania and the United States, including Plaintiffs, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by them.

667.    At all times relevant to this litigation, Plaintiffs used and/or were exposed to the use of the DuPont Defendants' PFAS and PFAS-containing products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

668.    Plaintiffs could not have reasonably discovered the defects and risks associated with PFAS and PFAS-containing products before or at the time of their exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of the DuPont Defendants.

669.    The DuPont Defendants knew or should have known that the minimal warnings disseminated with PFAS and PFAS-containing products were inadequate, but they failed to communicate adequate information on the dangers and safe use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended, and reasonably foreseeable uses, including at professional sports stadiums.

Case ID: 240501584

670. The information that the DuPont Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled athletes such as Plaintiffs to utilize the products safely and with adequate protection. Instead, the DuPont Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to PFAS, including PFOS and PFOA; continued to aggressively promote the efficacy of their products and chemicals, even after they knew or should have known of the unreasonable risks from use or exposure; and/or concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to PFAS and PFAS-containing products.

671. To this day, the DuPont Defendants have failed to adequately and accurately warn of the true risks associated with the use of and exposure to PFAS and PFAS-containing products.

672. To this day, the DuPont Defendants have failed to test, investigate, or study PFAS and PFAS-containing products.

673. As a result of their inadequate warnings, PFAS and PFAS-containing products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were distributed and sold by Defendants, and used by consumers like Plaintiffs.

674. The DuPont Defendants are liable to Plaintiffs for injuries caused by their failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their PFAS and PFAS-containing products and the risks associated with the use of or exposure to them.

Case ID: 240501584

675. The defects in the DuPont Defendants' PFAS and PFAS-containing products were substantial and contributing factors in causing Plaintiffs' damages, and, but for Defendants' misconduct and omissions, Plaintiffs would not have sustained these damages.

676. Had the DuPont Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with PFAS and PFAS-containing products, Plaintiffs could have avoided the risk of developing injuries as alleged herein.

677. As a direct and proximate result of the DuPont Defendants placing their defective PFAS and PFAS-containing products into the stream of commerce and failing to warn Plaintiffs of the increased risk of cancer associated with the use of and/or exposure to PFAS products and chemicals as described herein, Plaintiffs have developed cancer and was injured catastrophically, including having been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of comfort, and economic damages, including for medical care and treatment. Plaintiffs will continue to incur damages associated with these Defendant's failures in the future.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against the DuPont Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

### COUNT XXV: VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES ACT AND CONSUMER PROTECTION LAW, 73 P.S. SECTION 8201-1, ET SEQ.
### *PLAINTIFFS v. THE DUPONT DEFENDANTS*

678. Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

Case ID: 240501584

679.    At all relevant times, the DuPont Defendants knew or should have known of the unreasonably dangerous and carcinogenic nature of the use of and/or exposure to PFAS and PFAS-containing products.

680.    At all relevant times, the DuPont Defendants, through labeling, advertisements, public representations and marketing of PFAS and PFAS-containing products, intentionally used deception, fraud, false pretenses, false promises, misrepresentations, misleading statements, and unfair trade practices in order to mislead consumers that PFAS and PFAS-containing products are safe for use.

681.    At all relevant times, the DuPont Defendants also engaged in the concealment, suppression and/or omission of material facts in connection with the sale and/or advertisement of PFAS and PFAS-containing products in trade or commerce. In particular, the DuPont Defendants failed to disclose to the public that PFAS is unsafe and poses serious health hazards, particularly various cancers, which Plaintiffs had.

682.    The DuPont Defendants was aware of the hazardous risks posed by PFAS and PFAS-containing products and yet failed to inform the public of these risks through their advertisements, labeling, or other means available to them. The DuPont Defendants' failure to state material facts about PFAS and PFAS-containing products constitutes a violation of 73 P.S. §§ 201-1 et seq.

683.    At all relevant times, Plaintiffs were deceived by the DuPont Defendants' intentional misrepresentations and omissions, including by the orchestrated claims made on or in television commercials, advertising materials, websites, and on product labels and packaging regarding the usage and safety of PFAS and PFAS-containing products.

Case ID: 240501584

684.    At all relevant times, Plaintiffs acted in reasonable reliance upon the DuPont Defendants' unlawful trade practices, and had Defendant not engaged in the deceptive conduct described herein, Plaintiffs would not have played on AstroTurf that contained PFAS and/or would have protected themselves from exposure to the PFAS contained in the AstroTurf.

685.    As a direct and proximate result of the DuPont Defendants' unlawful trade practices, Plaintiffs developed cancer and were injured catastrophically, having been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of comfort, and economic damages.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against the DuPont Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

### COUNT XXVI: NEGLIGENCE
### *PLAINTIFFS v. THE DUPONT DEFENDANTS*

686.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

687.    At all relevant times, the DuPont Defendants breached their duty to Plaintiffs and were otherwise negligent in marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing PFAS and PFAS-containing products.

688.    The DuPont Defendants, directly or indirectly, caused PFAS and PFAS-containing products to be purchased and/or used by Plaintiffs.

689.    At all times relevant to this litigation, the DuPont Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of PFAS and PFAS-containing products, including the duty to

Case ID: 240501584

take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers, users, and other persons coming into contact with the product.

690.    At all times relevant to this litigation, the DuPont Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of PFAS and PFAS-containing products. The DuPont Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using PFAS and PFAS-containing products and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to PFAS and PFAS-containing products, and, in particular, PFOS and PFOA, and other toxic chemical contents.

691.    At all times relevant to this litigation, the DuPont Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of PFAS and PFAS-containing products.

692.    Accordingly, at all times relevant to this litigation, the DuPont Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to PFAS and PFAS-containing products could cause Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products and chemicals, including Plaintiffs.

693.    The DuPont Defendants knew or, in the exercise of reasonable care, should have known that any tests conducted limited to PFAS' content were insufficient to prove the safety of PFAS.

694.    The DuPont Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of PFAS were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to PFAS chemicals.

127

Case ID: 240501584

695.    The DuPont Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of PFAS and PFAS-containing products were unaware of the risks and the magnitude of the risks associated with the use of and/or exposure to PFAS and PFAS-containing products.

696.    As such, the DuPont Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of PFAS and PFAS-containing products , in that the DuPont Defendants manufactured, produced, and sold defective products and chemicals containing PFAS, including PFOS and PFOA, and other chemical contents, knew or had reason to know of the defects inherent in these products and chemicals, knew or had reason to know that a user's or consumer's exposure to PFAS and PFAS-containing products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

697.    The DuPont Defendants failed to appropriately and adequately develop, manufacture and test PFAS and PFAS-containing products to protect consumers like Plaintiffs.

698.    Despite their ability and means to investigate, study, and test PFAS and PFAS-containing products and to provide adequate warnings, the DuPont Defendants have failed to do so. Indeed, the DuPont Defendants have wrongfully concealed information and have further made false and/or misleading statements concerning the safety and/or exposure to PFAS products and chemicals.

699.    The DuPont Defendants' negligence included:

a)  Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing PFAS and PFAS-containing products without thorough and adequate pre- and post-market testing;

Case ID: 240501584

**b)** Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing PFAS and PFAS-containing products while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to PFOS and PFOA, and, consequently, the risk of serious harm associated with human use of and exposure to PFOS and PFOA;

**c)** Failing to undertake sufficient studies and conduct necessary tests to determine whether or not PFAS and PFAS-containing products were safe for their intended;

**d)** Failing to test, investigate, or study PFAS and PFAS-containing products;

**e)** Failing to undertake sufficient studies and conduct necessary tests to determine the safety of PFOS and PFOA, the toxicity of these chemicals, increase the toxicity of other products, and whether or not these ingredients and compounds were safe for use;

**f)** Failing to use reasonable and prudent care in the design, research, manufacture, formulation, and development of PFAS and PFAS-containing products so as to avoid the risk of serious harm associated with the prevalent use of PFAS and PFAS-containing products ;

**g)** Failing to design and manufacture PFAS and PFAS-containing products so as to ensure they were at least as safe and effective as other products on the market;

**h)** Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Defendants could reasonably foresee would use and/or be exposed to PFAS and PFAS-containing products;

**i)** Failing to disclose to Plaintiffs, users, consumers, and the general public that the use of and exposure to PFAS and PFAS-containing products presented severe risks of cancer and other grave illnesses;

**j)** Failing to warn Plaintiffs, users, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative products available to Plaintiffs, and other users or consumers;

**k)** Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effect of PFAS and PFAS-containing products;

**l)** Representing that PFAS and PFAS-containing products were safe for their intended use when, in fact, Defendants knew or should have known that the they were not safe for their intended use;

**m)** Declining to make or propose any changes to PFAS and PFAS-containing products labeling or other promotional materials that would alert the consumers and the general public of the risks of them;

**n)** Advertising, marketing, and recommending the use of PFAS and PFAS-containing products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of or exposure to PFAS;

**o)** Continuing to disseminate information to their consumers, which indicate or imply that PFAS and PFAS-containing products are not unsafe for their intended use;

**p)** Continuing the manufacture and sale of PFAS and PFAS-containing products with the knowledge that the products and chemicals were unreasonably unsafe and dangerous;

Case ID: 240501584

**q)** Failing to warn end users, consumers, and the general public, of the toxicity and danger of PFAS; and

**r)** Exposing end users, consumers, and the general public to the toxic chemicals contained in PFAS.

700.    The DuPont Defendants knew and/or should have known that it was foreseeable that consumers and/or users, such as Plaintiffs, would suffer injuries as a result of the DuPont Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of PFAS and PFAS-containing products.

701.    Plaintiffs did not know the nature and extent of the serious harm that could result from the intended use of and/or exposure to PFAS, including PFOS and PFOA.

702.    The DuPont Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiffs suffered, and will continue to suffer, as described herein.

703.    The DuPont Defendants' conduct, as described above, was reckless. The DuPont Defendants regularly risks the lives of consumers and users of PFAS and PFAS-containing products, including Plaintiffs, with full knowledge of the dangers of them. The DuPont Defendants have made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiffs, with respect to the dangers of PFAS and PFAS-containing products about which the DuPont Defendants knew but the public, including Plaintiffs, did not. The DuPont Defendants' reckless conduct therefore warrants an award of punitive damages.

704.    As a proximate result of the DuPont Defendants' wrongful acts and omissions in placing defective PFAS and PFAS-containing products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of them, Plaintiffs developed cancer and were injured catastrophically, having been caused severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of comfort, and economic damages, including

Case ID: 240501584

significant expenses for medical care and treatment, and will continue to incur these expenses in the future.

**WHEREFORE**, Plaintiffs demands damages, including punitive damages, against The DuPont Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

## COUNT XXVII: BREACH OF IMPLIED WARRANTIES
### *PLAINTIFFS v. THE DUPONT DEFENDANTS*

705.    Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

706.    At all relevant times, the DuPont Defendants were engaged in the business of testing, developing, designing, formulating, manufacturing, marketing, selling, distributing, and promoting PFAS and PFAS-containing products, which are defective and unreasonably dangerous to users, consumers and those in proximity to users, including Plaintiffs, thereby placing PFAS and PFAS-containing products into the stream of commerce. These actions were under the ultimate control and supervision of the DuPont Defendants.

707.    Before the time that Plaintiffs were exposed to the use of the aforementioned PFAS and PFAS-containing products, the DuPont Defendants impliedly warranted to their consumers and users—including Plaintiffs — that PFAS and PFAS-containing products were of merchantable quality and safe and fit for the use for which they were intended.

708.    The DuPont Defendants, however, failed to disclose that PFAS and PFAS-containing products has dangerous propensities when used as intended and that the use of and/or exposure to PFAS, including PFOS and PFOA, as it carries an increased risk of developing severe injuries and/or cancer, including Plaintiffs' damages.

131

Case ID: 240501584

709.    The DuPont Defendants further failed to test, investigate, or study PFAS and PFAS-containing products.

710.    Upon information and belief, Plaintiffs reasonably relied upon the skill, superior knowledge and judgment of the DuPont Defendants and upon their implied warranties that PFAS and PFAS-containing products were of merchantable quality and fit for their intended purpose or use.

711.    PFAS and PFAS-containing products were expected to reach and did in fact reach consumers, users and those in proximity to users, including Plaintiffs, without substantial change in the condition in which they were manufactured and sold by the DuPont Defendants.

712.    At all relevant times, the DuPont Defendants was aware that consumers, users, and those in proximity of users of their products and chemicals, including Plaintiffs, would use PFAS and PFAS-containing products as marketed by Defendants, which is to say that Plaintiffs were the foreseeable users/end users of PFAS and PFAS-containing products.

713.    The DuPont Defendants intended that PFAS and PFAS-containing products be used in the manner in which Plaintiffs in fact used or was exposed to them and the DuPont Defendants impliedly warranted their products and chemicals to be of merchantable quality, safe, and fit for this use, despite the fact that PFAS and PFAS-containing products were not adequately tested or researched.

714.    In reliance upon the DuPont Defendants' implied warranties, Plaintiffs used or were in proximity to the use of PFAS and PFAS-containing products as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by the DuPont Defendants.

132

715.     Plaintiffs could not have reasonably discovered or known of the risks of serious injury associated with PFAS and PFAS-containing products.

716.     The DuPont Defendants breached their implied warranties to Plaintiffs in that PFAS and PFAS-containing products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. PFAS has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

717.     The harm caused by PFAS and PFAS-containing products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative chemicals and products.

718.     As a direct and proximate result of the DuPont Defendants' wrongful acts and omissions, Plaintiffs suffered severe and permanent physical and emotional injuries and death.

**WHEREFORE**, Plaintiffs demand damages, including punitive damages, against the DuPont Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

### COUNT XXVIII: FRAUDULENT CONCEALMENT
### *PLAINTIFFS v. THE DUPONT DEFENDANTS*

719.     Plaintiffs incorporate by reference each and every other paragraph of this Complaint as if each were set forth fully and completely herein.

720.     The DuPont Defendants are estopped from asserting a statute of limitations defense because it fraudulently concealed their wrongful conduct from Plaintiffs with the intent that Plaintiffs, as well as other consumers and users of PFAS and PFAS-containing products, would justifiability rely on such material representations, on which Plaintiffs and others similarly situated did justifiability rely.

133

Case ID: 240501584

721.    The DuPont Defendants had actual knowledge that exposure to PFAS and, specifically, its toxic chemical contents, including PFOS and PFOA, could result in cancer and other severe illnesses and injuries. The DuPont Defendants knew or should have known that PFAS is toxic and that safety studies of PFAS were necessary to protect Plaintiffs from PFAS-containing products.

722.    The DuPont Defendants failed to conduct adequate testing of PFAS and PFAS-containing products.

723.    The DuPont Defendants had actual knowledge of their misrepresentations, negligence, breach of warranties, and false, misleading, deceptive, and unconscionable conduct. Even so, the DuPont Defendants perpetuated their wrongful conduct with the intent and fixed purpose of concealing their wrongs from Plaintiffs, and the public at large.

724.    Despite their knowledge that PFAS is toxic, the DuPont Defendants continued to promote PFAS and PFAS-containing products as safe.

725.    Plaintiffs were unaware of the falsity of these representations, acted in actual and justifiable reliance on such material misrepresentations, and were injured as a direct and proximate result.

726.    Additionally, the DuPont Defendants knowingly omitted material information and remained silent regarding said misrepresentations despite the fact that they had a duty to inform Plaintiffs, and the general public, of the inaccuracy of said misrepresentations, which omission constitutes a positive misrepresentation of material fact, with the intent that Plaintiffs and the general public would rely on the DuPont Defendants' misrepresentations.

727.    Plaintiffs and the general public did, in fact, act in actual and justifiable reliance on the DuPont Defendants' representations, and Plaintiffs suffered damages as a result.

Case ID: 240501584

728.    The DuPont Defendants, as the manufacturers and sellers of PFAS and PFAS-containing products were in a position of superior knowledge and judgment regarding any potential risks associated with their products and chemicals.

729.    The DuPont Defendants committed constructive fraud by breaching one or more legal or equitable duties owed to Plaintiffs and the general public relating to PFAS and PFAS-containing products, said breach or breaches constituting fraud because of their propensity to deceive others or constitute an injury to public interests or public policy.

730.    In breaching their duties to Plaintiffs, the DuPont Defendants used their position of trust as the manufacturer and/or distributor of PFAS to increase sales of their products and chemicals at the expense of informing Plaintiffs and the general public that use of or exposure to PFAS carries the risk of serious illness, such as cancer and other similar illnesses.

**WHEREFORE,** Plaintiffs demand damages, including punitive damages, against the DuPont Defendants, individually, jointly, and severally, in an amount in excess of the prevailing arbitration limits.

### COUNT XXIX: WRONGFUL DEATH ACTION
### *ESTATE OF DAVID WEST v. ALL DEFENDANTS*

731.    Plaintiff incorporates all preceding paragraphs in this Complaint here by reference.

732.    Plaintiff Jennifer West brings this action as personal representative of David West, on behalf of those entitled by law to recover for his wrongful death, under and by virtue of 42 Pa. C.S.A. § 8301, *et seq*, commonly known as the Pennsylvania Wrongful Death Act.

733.    No action for damages was brought by David West during his lifetime as a result of the incidents at issue in this case.

Case ID: 240501584

734. Plaintiff claims damages for the pecuniary loss suffered by decedent's beneficiaries by reason of the death of David West, and specifically for reimbursement of medical expenses, funeral expenses, and expenses of administration.

735. Plaintiff Jennifer West, individually and as Administratrix of the Estate of David West, claims for decedent's beneficiaries' damages resulting from the deprivation of comfort, aid, assistance, society and the loss of guidance and tutelage to his beneficiaries due to his death.

736. The acts and omissions set forth herein were done in a negligent, grossly negligent, willful, reckless and wanton fashion, with a conscious indifference to the rights of members of the public generally, and decedent in particular.

**WHEREFORE**, Plaintiff claims of Defendants, jointly and/or severally, sums in excess of the jurisdictional threshold in damages, exclusive of interest, costs, punitive damages and delay damages pursuant to Pa.R.C.P. §238, and brings this action to recover the same.

## COUNT XXX: SURVIVAL ACTION
### _ESTATE OF DAVID WEST v. ALL DEFENDANTS_

737. Plaintiff incorporates all preceding paragraphs of this complaint herein by reference.

738. Plaintiff, Jennifer West, Administratrix of the Estate of David West, brings this action under and by virtue of 42 Pa. C.S.A. § 8302, commonly known as the Pennsylvania Survival Act.

739. The Estate of David West claims damages for pain and suffering, embarrassment, humiliation, disfigurement, and loss of enjoyment of life undergone by the decedent as a result of the Defendants' tortuous conduct, up to and including the time of death, and damages for the

Case ID: 240501584

amount that David West would have earned from the date of his death to the end of his life expectancy.

740.    The acts and omissions set forth herein were done in a negligent, grossly negligent, willful, reckless and wanton fashion, with a conscious indifference to the rights of members of the public generally, and decedent in particular.

**WHEREFORE**, Plaintiff claims of Defendants, jointly and/or severally, sums in excess of the jurisdictional threshold in damages, exclusive of interest, costs, punitive damages and delay damages pursuant to Pa.R.C.P. §238, and brings this action to recover the same.

### COUNT XXXI: WRONGFUL DEATH ACTION
### *ESTATE OF DARREN DAULTON v. ALL DEFENDANTS*

741.    Plaintiff incorporates all preceding paragraphs in this Complaint here by reference.

742.    Plaintiff Amanda Daulton brings this action as personal representative of Darren Daulton, on behalf of those entitled by law to recover for his wrongful death, under and by virtue of 42 Pa. C.S.A. § 8301, *et seq*, commonly known as the Pennsylvania Wrongful Death Act.

743.    No action for damages was brought by Darren Daulton during his lifetime as a result of the incidents at issue in this case.

744.    Plaintiff claims damages for the pecuniary loss suffered by decedent's beneficiaries by reason of the death of Darren Daulton, and specifically for reimbursement of medical expenses, funeral expenses, and expenses of administration.

745.    Plaintiff Amanda Daulton, individually and as Administratrix of the Estate of Darren Daulton, claims for decedent's beneficiaries' damages resulting from the deprivation of comfort, aid, assistance, society and the loss of guidance and tutelage to his beneficiaries due to his death.

Case ID: 240501584

746.    The acts and omissions set forth herein were done in a negligent, grossly negligent, willful, reckless and wanton fashion, with a conscious indifference to the rights of members of the public generally, and decedent in particular.

**WHEREFORE**, Plaintiff claims of Defendants, jointly and/or severally, sums in excess of the jurisdictional threshold in damages, exclusive of interest, costs, punitive damages and delay damages pursuant to Pa.R.C.P. §238, and brings this action to recover the same.

### COUNT XXXII: SURVIVAL ACTION
### *ESTATE OF DARREN DAULTON v. ALL DEFENDANTS*

747.    Plaintiff incorporates all preceding paragraphs of this complaint herein by reference.

748.    Plaintiff, Amanda Daulton, Administratrix of the Estate of Darren Daulton, brings this action under and by virtue of 42 Pa. C.S.A. § 8302, commonly known as the Pennsylvania Survival Act.

749.    The Estate of Darren Daulton claims damages for pain and suffering, embarrassment, humiliation, disfigurement, and loss of enjoyment of life undergone by the decedent as a result of the Defendants' tortuous conduct, up to and including the time of death, and damages for the amount that Darren Daulton would have earned from the date of his death to the end of his life expectancy.

750.    The acts and omissions set forth herein were done in a negligent, grossly negligent, willful, reckless and wanton fashion, with a conscious indifference to the rights of members of the public generally, and decedent in particular.

Case ID: 240501584

**WHEREFORE**, Plaintiff claims of Defendants, jointly and/or severally, sums in excess of the jurisdictional threshold in damages, exclusive of interest, costs, punitive damages and delay damages pursuant to Pa.R.C.P. §238, and brings this action to recover the same.

## COUNT XXXIII: WRONGFUL DEATH ACTION
### *ESTATE OF JOHN VUKOVICH v. ALL DEFENDANTS*

**751.**    Plaintiff incorporates all preceding paragraphs in this Complaint here by reference.

**752.**    Plaintiffs Nicole Stolarick and Vincent Vukovich bring this action as personal representatives of John Vukovich, on behalf of those entitled by law to recover for his wrongful death, under and by virtue of 42 Pa. C.S.A. § 8301, *et seq*, commonly known as the Pennsylvania Wrongful Death Act.

**753.**    No action for damages was brought by John Vukovich during his lifetime as a result of the incidents at issue in this case.

**754.**    Plaintiffs claim damages for the pecuniary loss suffered by decedent's beneficiaries by reason of the death of John Vukovich, and specifically for reimbursement of medical expenses, funeral expenses, and expenses of administration.

**755.**    Plaintiffs Nicole Stolarick and Vincent Vukovich, individually and as Co-Administrators of the Estate of John Vukovich, claim for decedent's beneficiaries' damages resulting from the deprivation of comfort, aid, assistance, society and the loss of guidance and tutelage to his beneficiaries due to his death.

**756.**    The acts and omissions set forth herein were done in a negligent, grossly negligent, willful, reckless and wanton fashion, with a conscious indifference to the rights of members of the public generally, and decedent in particular.

139

Case ID: 240501584

**WHEREFORE**, Plaintiffs claims of Defendant, jointly and/or severally, sums in excess of the jurisdictional threshold in damages, exclusive of interest, costs, punitive damages and delay damages pursuant to Pa.R.C.P. §238, and brings this action to recover the same.

**COUNT XXXIV: SURVIVAL ACTION**
***ESTATE OF JOHN VUKOVICH v. ALL DEFENDANTS***

**757.**    Plaintiff incorporates all preceding paragraphs of this complaint herein by reference.

**758.**    Plaintiffs, Nicole Stolarick and Vincet Vukovich, Co-Administrators of the Estate of John Vukovich, bring this action under and by virtue of 42 Pa. C.S.A. § 8302, commonly known as the Pennsylvania Survival Act.

**759.**    The Estate of John Vukovich claims damages for pain and suffering, embarrassment, humiliation, disfigurement, and loss of enjoyment of life undergone by the decedent as a result of the Defendants' tortuous conduct, up to and including the time of death, and damages for the amount that John Vukovich would have earned from the date of his death to the end of his life expectancy.

**760.**    The acts and omissions set forth herein were done in a negligent, grossly negligent, willful, reckless and wanton fashion, with a conscious indifference to the rights of members of the public generally, and decedent in particular.

**WHEREFORE**, Plaintiffs claim of Defendants, jointly and/or severally, sums in excess of the jurisdictional threshold in damages, exclusive of interest, costs, punitive damages and delay damages pursuant to Pa.R.C.P. §238, and brings this action to recover the same.

Case ID: 240501584

## COUNT XXXV: WRONGFUL DEATH ACTION
### *ESTATE OF JOHNNY OATES v. ALL DEFENDANTS*

**761.** Plaintiff incorporates all preceding paragraphs in this Complaint here by reference.

**762.** Plaintiff, Gloria Oates' bring this action as personal representative of Johnny Oates, on behalf of those entitled by law to recover for his wrongful death, under and by virtue of 42 Pa. C.S.A. § 8301, *et seq*, commonly known as the Pennsylvania Wrongful Death Act.

**763.** No action for damages was brought by Johnny Oates during his lifetime as a result of the incidents at issue in this case.

**764.** Plaintiffs claim damages for the pecuniary loss suffered by decedent's beneficiaries by reason of the death of Johnny Oates, and specifically for reimbursement of medical expenses, funeral expenses, and expenses of administration.

**765.** Plaintiff Gloria Oates, individually and as Administratratrix of the Estate of Johnny Oates, claim for decedent's beneficiaries' damages resulting from the deprivation of comfort, aid, assistance, society and the loss of guidance and tutelage to his beneficiaries due to his death.

**766.** The acts and omissions set forth herein were done in a negligent, grossly negligent, willful, reckless and wanton fashion, with a conscious indifference to the rights of members of the public generally, and decedent in particular.

**WHEREFORE**, Plaintiff claims of Defendant, jointly and/or severally, sums in excess of the jurisdictional threshold in damages, exclusive of interest, costs, punitive damages and delay damages pursuant to Pa.R.C.P. §238, and brings this action to recover the same.

Case ID: 240501584

## COUNT XXXVI: SURVIVAL ACTION
### *ESTATE OF JOHNNY OATES v. ALL DEFENDANTS*

**767.** Plaintiff incorporates all preceding paragraphs of this complaint herein by reference.

**768.** Plaintiff, Gloria Oates, Administratrix of the Estate of Johnny Oates, brings this action under and by virtue of 42 Pa. C.S.A. § 8302, commonly known as the Pennsylvania Survival Act.

**769.** The Estate of Johnny Oates claims damages for pain and suffering, embarrassment, humiliation, disfigurement, and loss of enjoyment of life undergone by the decedent as a result of the Defendants' tortuous conduct, up to and including the time of death, and damages for the amount that Johnny Oates would have earned from the date of his death to the end of his life expectancy.

**770.** The acts and omissions set forth herein were done in a negligent, grossly negligent, willful, reckless and wanton fashion, with a conscious indifference to the rights of members of the public generally, and decedent in particular.

**WHEREFORE**, Plaintiff claims of Defendants, jointly and/or severally, sums in excess of the jurisdictional threshold in damages, exclusive of interest, costs, punitive damages and delay damages pursuant to Pa.R.C.P. §238, and brings this action to recover the same.

Case ID: 240501584

## COUNT XXXVII: WRONGFUL DEATH ACTION
### *ESTATE OF FRANK MCGRAW v. ALL DEFENDANTS*

**771.**    Plaintiff incorporates all preceding paragraphs in this Complaint here by reference.

**772.**    Plaintiffs, Timothy McGraw and Jennifer Brusstar bring this action as personal representatives of Frank McGraw, on behalf of those entitled by law to recover for his wrongful death, under and by virtue of 42 Pa. C.S.A. § 8301, *et seq*, commonly known as the Pennsylvania Wrongful Death Act.

**773.**    No action for damages was brought by Frank McGraw during his lifetime as a result of the incidents at issue in this case.

**774.**    Plaintiffs claim damages for the pecuniary loss suffered by decedent's beneficiaries by reason of the death of Frank McGraw, and specifically for reimbursement of medical expenses, funeral expenses, and expenses of administration.

**775.**    Plaintiff, Timothy McGraw and Jennifer Brusstar, Co-Administrators of the Estate of Frank McGraw, claim for decedent's beneficiaries' damages resulting from the deprivation of comfort, aid, assistance, society and the loss of guidance and tutelage to his beneficiaries due to his death.

**776.**    The acts and omissions set forth herein were done in a negligent, grossly negligent, willful, reckless and wanton fashion, with a conscious indifference to the rights of members of the public generally, and decedent in particular.

**WHEREFORE**, Plaintiffs claim of Defendant, jointly and/or severally, sums in excess of the jurisdictional threshold in damages, exclusive of interest, costs, punitive damages and delay damages pursuant to Pa.R.C.P. §238, and brings this action to recover the same.

Case ID: 240501584

## COUNT XXXVIII: SURVIVAL ACTION
### *ESTATE OF FRANK MCGRAW v. ALL DEFENDANTS*

777.    Plaintiff incorporates all preceding paragraphs of this complaint herein by reference.

778.    Plaintiffs, Timothy McGraw and Jennifer Brusstar, Co-Administrators of the Estate of Frank McGraw, bring this action under and by virtue of 42 Pa. C.S.A. § 8302, commonly known as the Pennsylvania Survival Act.

779.    The Estate of Frank McGraw claims damages for pain and suffering, embarrassment, humiliation, disfigurement, and loss of enjoyment of life undergone by the decedent as a result of the Defendants' tortuous conduct, up to and including the time of death, and damages for the amount that Frank McGraw would have earned from the date of his death to the end of his life expectancy.

780.    The acts and omissions set forth herein were done in a negligent, grossly negligent, willful, reckless and wanton fashion, with a conscious indifference to the rights of members of the public generally, and decedent in particular.

**WHEREFORE**, Plaintiffs claim of Defendants, jointly and/or severally, sums in excess of the jurisdictional threshold in damages, exclusive of interest, costs, punitive damages and delay damages pursuant to Pa.R.C.P. §238, and brings this action to recover the same.

## COUNT XXXIX: LOSS OF CONSORTIUM
### *BARBARA JACKSON v. ALL DEFENDANTS*

781.    Plaintiff incorporates all preceding paragraphs in this Complaint here by reference.

782.    Plaintiff Barbara Jackson is and was at all relevant times the wife of Plaintiff, Danny Jackson, and as such, is entitled to his society, companionship and services.

144

**783.** By reason of the Defendants' carelessness, negligence, gross negligence, recklessness, outrageousness, and strict liability, as fully set forth above and incorporated by reference as though fully set forth herein, wife-plaintiff Barbara Jackson has suffered the loss of consortium and has been deprived of her husband's love, companionship, comfort, affection, society, moral guidance, intellectual strength and physical assistance and the loss of the assistance and earnings of plaintiff-husband.

**WHEREFORE**, Plaintiff, Barbara Jackson, claims of all Defendants, jointly and severally, sums in excess of the jurisdictional threshold in damages, exclusive of interest, costs, and damages, pursuant to Pa. R.C.P. §238, and brings this action to recover the same.

### COUNT XL: LOSS OF CONSORTIUM
### *MELISSA KRUK v. ALL DEFENDANTS*

**784.** Plaintiff incorporates all preceding paragraphs in this Complaint here by reference.

**785.** Plaintiff Melissa Kruk is and was at all relevant times the wife of Plaintiff, John Kruk, and as such, is entitled to his society, companionship and services.

**786.** By reason of the Defendants' carelessness, negligence, gross negligence, recklessness, outrageousness, and strict liability, as fully set forth above and incorporated by reference as though fully set forth herein, wife-plaintiff Melissa Kruk has suffered the loss of consortium and has been deprived of her husband's love, companionship, comfort, affection, society, moral guidance, intellectual strength and physical assistance and the loss of the assistance and earnings of plaintiff-husband.

**WHEREFORE**, Plaintiff, Melissa Kruk, claims of all Defendants, jointly and severally, sums in excess of the jurisdictional threshold in damages, exclusive of interest, costs, and damages, pursuant to Pa. R.C.P. §238, and brings this action to recover the same.

Case ID: 240501584

## COUNT XLI: LOSS OF CONSORTIUM
## *GLORIA OATES v. ALL DEFENDANTS*

**787.**  Plaintiff incorporates all preceding paragraphs in this Complaint here by reference.

**788.**  Plaintiff Gloria Oates is and was at all relevant times the wife of Plaintiff, Johnny Oates, and as such, is entitled to his society, companionship and services.

**789.**  By reason of the Defendants' carelessness, negligence, gross negligence, recklessness, outrageousness, and strict liability, as fully set forth above and incorporated by reference as though fully set forth herein, wife-plaintiff Gloria Oates has suffered the loss of consortium and has been deprived of her husband's love, companionship, comfort, affection, society, moral guidance, intellectual strength and physical assistance and the loss of the assistance and earnings of plaintiff-husband.

**WHEREFORE**, Plaintiff, Gloria Oates, claims of all Defendants, jointly and severally, sums in excess of the jurisdictional threshold in damages, exclusive of interest, costs, and damages, pursuant to Pa. R.C.P. §238, and brings this action to recover the same.

**SALTZ MONGELUZZI BENDESKY, P.C.**

BY:  */s/ Robert J. Mongeluzzi*
ROBERT J. MONGELUZZI
LARRY BENDESKY
ANDREW R. DUFFY
AIDAN B. CARICKHOFF
*Attorneys for Plaintiffs*

146

Case ID: 240501584

# VERIFICATION



Filed and Attested by the
Office of Judicial Records
30 JUN 2025 11:41 am
E. IMPERATO

The averments or denials of fact contained in the foregoing are true based upon the signer's personal knowledge or information and belief. If the foregoing contains averments which are inconsistent in fact, signer has been unable, after reasonable investigation, to ascertain which of the inconsistent averments are true, but signer has knowledge or information sufficient to form a belief that one of them is true. This Verification is made subject to the penalties of the 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

Date: 06/30/25

## <u>VERIFICATION</u>

The averments or denials of fact contained in the foregoing are true based upon the signer's personal knowledge or information and belief. If the foregoing contains averments which are inconsistent in fact, signer has been unable, after reasonable investigation, to ascertain which of the inconsistent averments are true, but signer has knowledge or information sufficient to form a belief that one of them is true. This Verification is made subject to the penalties of the 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

Amanda Daulton

Date: 06/30/25

## VERIFICATION

The averments or denials of fact contained in the foregoing are true based upon the signer's personal knowledge or information and belief. If the foregoing contains averments which are inconsistent in fact, signer has been unable, after reasonable investigation, to ascertain which of the inconsistent averments are true, but signer has knowledge or information sufficient to form a belief that one of them is true. This Verification is made subject to the penalties of the 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

*Barbara Jackun*

**Date:** 06/30/25

Case ID: 240501584

# <u>VERIFICATION</u>

The averments or denials of fact contained in the foregoing are true based upon the signer's personal knowledge or information and belief. If the foregoing contains averments which are inconsistent in fact, signer has been unable, after reasonable investigation, to ascertain which of the inconsistent averments are true, but signer has knowledge or information sufficient to form a belief that one of them is true. This Verification is made subject to the penalties of the 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

Date:    06/30/25

Case ID: 240501584

## VERIFICATION

The averments or denials of fact contained in the foregoing are true based upon the signer's personal knowledge or information and belief. If the foregoing contains averments which are inconsistent in fact, signer has been unable, after reasonable investigation, to ascertain which of the inconsistent averments are true, but signer has knowledge or information sufficient to form a belief that one of them is true. This Verification is made subject to the penalties of the 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

_____
Jennifer West

Date: 06/30/25 _____

Case ID: 240501584

## VERIFICATION

The averments or denials of fact contained in the foregoing are true based upon the signer's personal knowledge or information and belief. If the foregoing contains averments which are inconsistent in fact, signer has been unable, after reasonable investigation, to ascertain which of the inconsistent averments are true, but signer has knowledge or information sufficient to form a belief that one of them is true. This Verification is made subject to the penalties of the 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

_____
John Kruk

Date: 06/30/25

Case ID: 240501584

## VERIFICATION

The averments or denials of fact contained in the foregoing are true based upon the signer's personal knowledge or information and belief. If the foregoing contains averments which are inconsistent in fact, signer has been unable, after reasonable investigation, to ascertain which of the inconsistent averments are true, but signer has knowledge or information sufficient to form a belief that one of them is true. This Verification is made subject to the penalties of the 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

_____
Melissa Kruk

Date: ___06/30/25_____

Case ID: 240501584

# <u>VERIFICATION</u>

The averments or denials of fact contained in the foregoing are true based upon the signer's personal knowledge or information and belief. If the foregoing contains averments which are inconsistent in fact, signer has been unable, after reasonable investigation, to ascertain which of the inconsistent averments are true, but signer has knowledge or information sufficient to form a belief that one of them is true. This Verification is made subject to the penalties of the 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

Nikki   Vukovich

Date: 06/30/25

Case ID: 240501584

## <u>VERIFICATION</u>

The averments or denials of fact contained in the foregoing are true based upon the signer's personal knowledge or information and belief. If the foregoing contains averments which are inconsistent in fact, signer has been unable, after reasonable investigation, to ascertain which of the inconsistent averments are true, but signer has knowledge or information sufficient to form a belief that one of them is true. This Verification is made subject to the penalties of the 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.

_____

Vince Vukovich

Date: 06/30/25
_____

Case ID: 240501584

### CERTIFICATE OF SERVICE

I, Andrew R. Duffy, Esq., hereby certify that a true and correct copy of the within

document was served on all counsel of record via the Court's electronic filing system and

unrepresented parties by U.S. Postal Service Regular Mail.

*/s/ Andrew R. Duffy*

Filed and Attested by the
Office of Judicial Records
30 JUN 2025 11:41 am
G. IMPERATO